(No. 16034.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANTON STERANKOVICH, Plaintiff in Error.

*Opinion filed October 28, 1924.*

1. CRIMINAL LAW—*what evidence is incompetent and prejudicial in murder trial.* In a trial of a defendant charged with murder in shooting his adversary in a fight, evidence tending to show that the defendant, prior to the fight, had assaulted and beaten his own wife, that he went to a neighbor's with a knife in his hand and conducted himself offensively, boisterously and threateningly, is not admissible and is very prejudicial where said circumstances had nothing to do with the fight, (which occurred later in the defendant's own house,) and throw no light on the question as to who was the aggressor or as to the motive or intent of the defendant.

2. SAME—*what instruction should not be given in homicide case.* An instruction in the language of section 155 of the Criminal Code, in regard to the burden of proof, should never be given in a homicide case.

3. SAME—*what instruction as to self-defense is improper.* In a murder trial an instruction that "before a person can be justified in resorting to a deadly weapon and using it in a deadly manner it must appear that he was in imminent peril of death or of great bodily harm, * * * and that he could not have otherwise reasonably saved his life or person," is not proper, as the law is that a defendant need not exhaust every effort to escape where he is in a place where he has a right to be but may meet force with force, even to the taking of his assailant's life, if necessary, or apparently necessary, to save his own life or prevent great bodily harm.

WRIT OF ERROR to the Circuit Court of Madison county; the Hon. LOUIS BERNREUTER, Judge, presiding.

D. H. MUDGE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JOSEPH P. STREUBER, State's Attorney, and JAMES B. SEARCY, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Anton Sterankovich, alias Anton Stanek, was convicted in the circuit court of Madison county of the murder of August Yurgin and sentenced to fourteen years' imprisonment in the penitentiary, and has sued out a writ of error.

Stanek was a coal miner, residing at Glen Carbon with his family at the time of the homicide, October 2, 1923. He weighed about 147 pounds. He had broken his hip in January, 1923, and at the time of the homicide the leg was still weak. Yurgin was a strong, muscular man, weighing 180 or 185 pounds. The two men were friends and neighbors. On the afternoon of October 2, 1923, before the homicide, Yurgin went to the home of Stanek. Another neighbor, Mrs. Giza, was there also, as was Stanek. Yurgin brought a half-pint bottle of white mule, from which the three drank. Yurgin and Mrs. Giza left the place. The drink made Mrs. Giza sick, and her husband went to the home of Stanek to learn what made her sick. After Yurgin and Mrs. Giza left Stanek's home, but before Giza called there, Mrs. Stanek went to the home of Mrs. G. W. Ingels and exhibited some severe wounds and bruises on her body. Her face was bruised, her gums were bleeding, there was a severe bruise on her left breast and a lump the size of a goose egg on the inside of one of her legs. Her clothing was badly torn. She attributed her condition to her husband. Mrs. Ingels learned from her that Stanek had gone to the home of John Lehotz, and Mrs. Ingels went there, but before she reached the place Stanek had gone back to his own home. When Stanek approached the home of Lehotz, G. W. Ingels and Lehotz were there. Stanek's face and hands were bloody and he had a knife in his hand, with the blade up his sleeve. He said, "I am going to clean up on all the bachelors at No. 4," and made a remark about killing his wife and kids. Lehotz said, "Afton, what you doing now? Where you get that bloody face and hands?" Stanek answered, "That is none of your business."

Lehotz said, "Go home, wash your face and hands, then we talk nice here." Stanek said, "You can't make me get off yard; yard don't belong to you,—belong to Uncle Sam." Stanek then washed his hands at the cistern and the blood ran back in the cistern. Lehotz told him that they drank the water, and Stanek said he didn't care, went outside, and said, "I wait now until the sheriff comes." In a few minutes Stanek went to his own home and a few minutes later Ingels followed him over. Ingels testified as a reason for going that they both belonged to the same order and he thought it his duty. When Ingels reached Stanek's home, Giza and Stanek were there talking. Giza had been there about five or ten minutes. Giza had found Stanek and the children there. Stanek had a scratch over his eye which was bleeding and blood was on his face. Giza asked, "Who made him blood?" Stanek answered, "I know who make me," but did not tell who it was. This was just before five o'clock in the afternoon. When Ingels went into the Stanek home he found Stanek was dressed up and had two sons, his oldest about thirteen and Johnny about seven years of age, with him. Ingels said, as he testified, "What to hell is the matter with you, Stanek? Shame on you; you ought to be ashamed of yourself; where are you going?" Stanek replied that he was going to leave, and in response to the question, "What are you going to do with the kids?" said, "Never mind; I will find a place for them." In the meantime Mrs. Ingels had gone to the home of Lehotz, and, not finding Stanek there, had requested Lehotz and Yurgin, who just then came up to get some water, to go with her to Stanek's house. The three reached Stanek's house a few minutes after Ingels. Mrs. Ingels entered first. She carried a small stick as a protection against a dog, as she testified. She testified that when she entered she said, "What do you intend to do about your wife?" He said, "What are they going to do to me? I am an American citizen." She said, "Well, you will land in the penitentiary

if you keep this up," and she further testified that he then reeled and ran and got his gun, came back and pointed it at her; that Ingels jumped up from the table and got in front of her and struck Stanek with the stick which she had brought with her. Ingels also testified that Stanek at this time had a gun, which he was pointing at Mrs. Ingels. No one else who testified saw the gun. Stanek denied that he then had it. Yurgin immediately attacked Stanek, knocked him down, grabbed him by the throat, choked him, pushed him back through the door into and through another room, and into a third room and down to the floor in a corner by the cupboard. Giza attempted to separate the men. Stanek fired the gun, and the bullet grazed Giza's finger and struck Yurgin in the neck, inflicting a wound from which he afterward died. Stanek testified that as he was in the corner he reached to the cupboard and got the gun from there. Giza, who sat at the table with Stanek and Ingels when Mrs. Ingels entered and when Ingels struck Stanek with the stick, did not see the gun, nor did Lehotz, who stood in the outer door during the struggle. Willie, the son of Stanek, eleven years of age, testified that Stanek got the gun from the cupboard while the fight was in the corner there.

The question whether the evidence justified a verdict of guilty of murder was so close as to require that the trial should be free from prejudicial error. Even if the defendant had a gun and pointed it at Mrs. Ingels, as she and her husband said he did, yet he did not shoot even when Ingels struck him on the head with sufficient force to break the stick, nor when Yurgin attacked him, but only shot when his antagonist, who was far superior to him physically, had pressed him into the corner and to the floor in the third room.

All of the testimony in regard to the injuries of the plaintiff in error's wife was admitted over his objection. So was the testimony in regard to the plaintiff in error's

going to Lehotz's home with a knife up his sleeve, his statement that he was going to clean up on all the bachelors at No. 4, and his remark about killing his wife and kids. This testimony was all incompetent. It had no relation to the affray which afterward occurred at the house of the plaintiff in error. If he had assaulted and beaten his wife, if she had been injured and in the struggle he had received an injury which made his face and hands bloody, if he went to a neighbor's with a knife in his hand and conducted himself offensively, boisterously and threateningly, these things have nothing to do with the assault which later occurred in his own house. They throw no light on the question who was the aggressor in that fight, the violence of the struggle, the motive or intent of the plaintiff in error or the extent of the apparent danger to him. The circumstances were, however, of such a character as to be very prejudicial to him in the estimation of the jury. If he had really assaulted and beaten his wife, as the evidence indicated, that fact and the wife's condition would naturally excite the indignation of the jury against him. He was not on trial for that offense, could not introduce any evidence of the circumstances or make any defense to that charge, and the evidence should not have been admitted.

In this connection objection is made to instruction No. 9, which was as follows:

"The court instructs the jury, as a matter of law, that the defendant in this case cannot avail himself of the claim of self-defense if you believe from all the evidence in the case, beyond a reasonable doubt, that the necessity for self-defense was brought on by the deliberate and wrongful act of the defendant who claims that defense."

It is argued that the instruction, in connection with the evidence that Yurgin, Mr. and Mrs. Ingels and Lehotz had gone to the plaintiff in error's house because of his trouble with his wife, virtually told the jury that the plaintiff in error could not avail himself of the right of self-defense if

the jury believed from the evidence, beyond a reasonable doubt, that had he not assaulted his wife,—a deliberate and wrongful act,—the necessity for self-defense would not have arisen, and therefore he could not rely upon that as a defense to the charge of murder. The instruction intensified the error that occurred in admitting the evidence. It should not have been given.

People's instruction No. 4 is a copy of section 155 of the Criminal Code. It should not have been given. It is said in *People* v. *Durand,* 307 Ill. 611, it should not be given as an instruction in any homicide case.

Instruction No. 6 was as follows:

"The court instructs the jury, as a matter of law, that before a person can be justified in resorting to a deadly weapon and using it in a deadly manner it must appear that he was in imminent peril of death or of great bodily harm, or that a reasonable person under like circumstances would have reasonable grounds to believe that he was in peril of losing his life or sustaining great bodily harm and that he could not have otherwise reasonably saved his life or person from great bodily harm."

It is substantially the same as an instruction condemned in *People* v. *Durand, supra,* in the following language: "The old doctrine of the common law that the right of self-defense is denied to a man until he has exhausted every effort to escape is not now the law of this State, but the law is that where a person is in a place where he has a lawful right to be and is unlawfully assaulted by another and put in apparent danger of his life or great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force, even to the taking of his assailant's life, if necessary, or apparently necessary, to save his own life or to prevent great bodily harm.—*Hammond* v. *People,* 199 Ill. 173; *Baird* v. *United States,* 158 U. S. 550."

313—36

The court's rulings on other objections made to instructions given were correct, and the objections were not of such a character as to require discussion.

The plaintiff in error complains of the refusal of the court to give his offered instructions 1, 2, 5 and 6. The substance of the first three mentioned is contained in instructions which were given, and the sixth directed a verdict of not guilty upon insufficient grounds and was properly refused.

The judgment will be reversed and the cause remanded for a new trial.

*Reversed and remanded.*