THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERTA NEWMAN, Plaintiff in Error.

*Opinion filed April 24, 1936—Rehearing denied June 4, 1936.*

J. E. HOGAN, CARL H. PREIHS, and HARRY GRUNDY, for plaintiff in error.

OTTO KERNER, Attorney General, JOHN W. COALE, State's Attorney, and A. B. DENNIS, (SCOTT HOOVER, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

Roberta Newman was found guilty of murder and given the minimum sentence for that crime—fourteen years' imprisonment—by a jury in the circuit court of Christian county. By this writ of error she seeks reversal of the judgment.

A clandestine love affair between two young married persons, aided by drunkenness on the part of one of them, culminated in a shooting affray which resulted fatally for William Willett. He was a coal miner, aged twenty-two,

and Roberta Newman, then twenty-six, was the wife of another coal miner, living in Taylorville. She had been reared in Oklahoma, and at various times prior to her marriage had been a telephone operator, a newspaper correspondent and a clerk in a Sears Roebuck store. Soon after she and her husband came to Taylorville, in 1932, they met Mr. and Mrs. Willett and the two couples mingled socially. Willett often rode to work with Newman. During the summer of 1933, when Willett's wife left him for five or six weeks, he came, at the invitation of Newman, to the latter's home to board and room. Newman worked days at the mine while Willett worked nights. Another coal miner, named Brown, also had a room at the Newman home. Shortly after arriving at the Newman home Willett began making advances to Roberta, which, after about five days, resulted in illicit relations. These adulterous acts continued, with more or less frequency, until the latter part of December, 1933, when Willett left Taylorville and began seeking work in other places. While living in Springfield he made several visits to the Newman home in January, 1934.

Except for the two participants there were no eye-witnesses to what happened at the Newman home on January 31, 1934, the date and place of the shooting. The story as related by Roberta at the trial is substantially as follows: She saw Willett that day first about noon, when he came to the back door and was trying to get in. He was very drunk. A companion was waiting outside in a car, and Willett asked if he could bring him in to get warm. Roberta said she told Willett the stranger could come in if he, Willett, would go away with him. Shortly afterward the stranger left but Willett stayed and began quarreling with her. She said he told her she had to leave her husband or he was going to kill them both. She repeatedly asked him to leave so she could go to a cooking school. She then went to the store for groceries in the afternoon,

but he followed her and helped her carry the groceries home. She said she set the groceries on the kitchen table and he went up-stairs to the bath-room. She heard him up-stairs opening drawers and went up and told him to get out and made him go back down-stairs. When he came down-stairs she said she noticed that he had something in his pocket in the shape of a gun and asked him for it, but he refused to give it to her. She said he sat down in a chair in the living-room and loaded and unloaded the gun. She sat on the arm of the chair and asked him to let her have the gun. He stuck the gun against her breast and asked her how she would like to die. She then knocked it down and took it away from him, laid it on the dining-table in the next room and asked him to leave. He finally left, and she baked a pie during the time he was gone. While she was up-stairs in the bath-room, washing her hands after baking the pie, she heard someone come in. She went down to see who it was and found Willett again in the kitchen—this time with a bottle of liquor and attempting to draw a glass of water. She said she was then standing in the doorway between the kitchen and dining-room, when he walked up close to her and said, "Do you mean what you said about your not going to live with me?" She said, "Yes." He then replied, "If you are not going to live with me you are sure as hell not going to live with any-one else," and knocked her out of the doorway toward the dining-room. When she saw he was trying to get to the gun on the dining-table she tried to get there first, and they both reached it about the same time. She grabbed the barrel of the gun as he grabbed the "handle end." She said it was pointed toward her body but she was pushing it back away from her, and while they were both fighting for its possession the gun went off. After hearing one shot she became sick and dizzy and did not know what happened, nor could she recall what happened thereafter. She said that when she first realized anything she was partly stand-

ing and partly resting on his knees and could feel the pistol and his hands against the back of her legs. She got up and ran from the house to call the police. Upon going a short distance she discovered a bullet wound in her left hand, which was bleeding profusely, and caused her to return to the house. She said she then still believed that Willett would kill her, so she stood on her front porch and called to a passer-by for aid. He called the police, and an ambulance took Willett and Roberta to the hospital. Her wound was slight, but Willett, who remained conscious for a short time, died about 9:00 o'clock that night. Roberta further testified that about the middle of January, 1934, Willett had come to her home while drunk, and on that occasion had pulled out a gun and said he was going to kill her if she did not give him some money and live with him. At that time a domestic, named Elizabeth Williams, who was working for Roberta, helped her take the gun away from Willett and push him out the door. After sitting on the porch awhile he then went away. This testimony was corroborated in its entirety by Elizabeth Williams.

Frances Due testified that on January 30, 1934, Willett came to her home on East Washington street, in Springfield, to secure some liquor and exhibited a photograph of Roberta, saying he thought he had credit with her in Taylorville for $300. He then took a blue-steel revolver from his pocket, held it in his hand, patted it with the fingers of his other hand, and said: "I am going down to Taylorville to see Bert, and if she thinks she can give me the run around and not go with me any further I will show the bitch something. Jack Brown and I are going to Taylorville to-morrow and we may have some action." This threat was made the day before the killing.

The testimony of another witness, Harry Fustin, was offered to prove that late in January, 1934, he was talking to Willett on the street when Roberta passed along the sidewalk; that Willett called to her and told her to stop, but

she kept on walking, and that Willett then turned to the witness and asked him if he could borrow his gun. The refusal of the trial court to allow this evidence to go into the record is an alleged error.

In behalf of the prosecution it was shown from an examination of Willett after his arrival at the hospital that he had four gun-shot wounds—in the right wrist, left side, right shoulder and right groin. Roberta's wound showed that the bullet had gone in from the back of her left hand. Ed Zemke, chief of police, testified that when he reached the Newman home he found the revolver, with five empty shells, lying in the doorway between the kitchen and dining-room and Willett lying in the kitchen with his head near the door into the dining-room. He took Willett and Roberta in the ambulance to the hospital. Upon arrival there Zemke related that Willett, still conscious, asked Roberta why she shot him. She replied, "Did I shoot you?" and Willett looked around and said, "I guess not." She kissed him and he called her "honey" several times. Before reaching the hospital Roberta had asked Zemke if he thought Willett would live, and had brushed his hair back and kissed him. It was shown by this witness that the Newman house faced north, with the living-room on the north or front side, followed by a dining-room and kitchen in the rear; that a large aperture separated the dining and living rooms, and that the front entrance was on the west side of the living-room, with stairs to the second floor leading up directly from the entrance. Zemke testified that he made an examination of the house and found three bullet holes—one on the floor between the dining and living rooms, one through the davenette against the north wall of the living-room, and a third had entered the front or east side of a cedar chest located against the west wall of the dining-room.

It is shown by the deposition of Hardy Walker, a coal miner, who lived at the Newman home on January 31,

1934, that he was the owner of the 38-caliber revolver found on the floor after the shooting, and that when he left on the morning in question he left this revolver, loaded, in a drawer in the up-stairs room occupied by him.

Mrs. Thelma Willett, the widow, testified that she and Roberta had been good friends and visited each others' homes frequently. She said that she and Willett had had marital difficulties, which led her to believe that another woman had come into his life; that after her return from seven or eight weeks' absence in Akron, Ohio, she confronted Roberta with this fact and asked her if she, Roberta, had had anything to do with him, and that Roberta had replied in the negative. To this Mrs. Willett said, "I don't see what you want with him either." She saw Roberta at various other times and places, and on one occasion asked her why she did not leave her husband alone, and Roberta replied, "Why don't you leave mine alone?" To this Mrs. Willett said: "If you will leave my husband alone I will guarantee I won't bother yours. You know we have just been friends and that is all." During part of this time Willett and his wife were not living together and she was working in a cafe in Taylorville. In the latter part of 1933 the two women had a quarrel one day when Roberta came to Mrs. Willett's home and demanded from Willett the letters she had written to him, offering to turn over to his wife the letters which Willett had written her. Willett said he had burned her letters. This was disputed by Roberta, who claimed that Mrs. Willett had possession of them. After this quarrel, and before leaving, Roberta said to Mrs. Willett that she was not interested in Willett any more and was through with him. As a matter of fact, however, Mrs. Willett then had the letters written by Roberta, having secured them from her husband's coat pocket. After this episode Willett sent his wife to Logan during December, 1933, while he went to

Springfield and lived with his mother. They continued living apart most of the time thereafter until Willett's death.

Willett's mother testified that Roberta had come to her home in Springfield three or four times during the month of January, 1934, and asked for her son, calling him "Snooks." On one occasion, in December, the witness related that Roberta said she and Willett were preparing to leave together.

A deputy sheriff named Elmer Deeren testified for the People that he was at the hospital when Roberta and Willett were brought in. He said that he was with two other persons, one of whom asked Roberta where the gun came from. According to him her reply was, "She went upstairs and got it from that dresser, out of a drawer that belonged to a roomer there, and come down the stairway and before she got to the bottom of the steps she commenced to hammer at him." Another witness, Effie Murphy, of Springfield, who admitted that she formerly ran a "bootlegging joint" near Taylorville and later became housekeeper for Newman while Roberta was in jail, also testified to a purported conversation with Roberta. On one occasion, a year from the date Willett was killed, Effie said she asked Roberta if she did not get the jitters on that anniversary. To this she said Roberta replied in the negative and related that she had spent $340 on Willett and that nobody was going to quit her or give her away after she had spent her money on him. This witness further related that Roberta said she went up-stairs and got a gun and came down-stairs, and as Willett was going out the door "she just let him have it." It may be noted in passing that the testimony of these last two witnesses as to the manner of the shooting is at distinct variance and cannot be reconciled with other testimony, especially not with the physical facts, as shown to exist by the chief of police, who described definitely the location of three bullet holes. In rebuttal, two reputable witnesses who for many years had

known Effie Murphy and were acquainted with her repu-. tation in Taylorville for truth and veracity, testified that such reputation was bad.

Over objections of the defendant the court permitted the People to introduce eight letters written by Roberta to Willett, explaining that the letters were admitted only for the purpose of showing the relation of the parties and were not to be considered by the jury for any other purpose. After the introduction and reading of these letters by the State's attorney the defense introduced eight letters written by Willett to Roberta. All sixteen letters were full of equally endearing terms and confirm the fact that both Roberta and Willett had been committing adultery together and had planned to leave their mates in order to live together permanently. Each was apparently trying to get his or her spouse to get a divorce for that purpose. In one of her letters Roberta wrote in part: "I just don't want to get you into anything honey; I wish you wouldn't carry that g— hon. am afraid you'll do something before you think & hon you're in a position where you can't,—You wouldn't have an ounce of a chance." In one of Willett's letters to Roberta we find this language: "You know I am not afraid of Emmet, I know he is a dirty coward and wont do anything only when he gets the drop on me which I don't intend for him to do no more. if he wants to whip me and can O.K. if he will·do it fair. * * * Emmet and I are going to have an understanding, he has got to stay away from you and I, for you are mine. * * * I am going to talk to Emmet if he will talk reason O.K. if· he won't he can go to hell."

After reviewing the evidence and briefs we are satisfied that the proof produced failed to show, beyond a reasonable doubt, that Roberta intentionally killed Willett. The theory of the People was that Roberta, as a woman spurned and neglected by her paramour, did the shooting in a fit of jealous rage and not in self-defense. The evi-

dence does not substantiate this theory. On the contrary, the story told by Roberta, the only living witness to the tragedy, is a reasonable one, which vigorous cross-examination failed to change or weaken. Her actions and testimony both confirm her fear that Willett intended to kill her, and even one of her letters above quoted shows that she feared what might happen if he continued to carry that g—, meaning a gun. The evidence also shows, without question, that on previous occasions he carried and exhibited a gun and had made certain boasts and threats with reference to Roberta. Her story of what actually happened in her home on January 31 cannot be ignored, as it is not only reasonable but was also corroborated, in whole or in part, by many other circumstances. It is not disputed that Willett had no legitimate business in her home in Taylorville on that day and that he unexpectedly came there from Springfield in a very drunken condition. His quarrelsome disposition, especially when drunk, was shown by conclusive evidence. The only doubt raised by any of the State's witnesses had to do principally with who went up-stairs and got the gun, and is based upon an alleged statement made by Roberta in one of the corridors of the hospital and which she vigorously denied. Her claim is that she told these two questioners that "he" (meaning Willett) went up-stairs and got the gun from a drawer, but that they either altered or misunderstood her statement and repeated it to the effect that "she" procured the gun. She denied the remainder of the purported statement *in toto*.

The witness Deeren, who testified that Roberta had said she shot Willett while coming down the stairs or while he was going out the front door, after she obtained the gun from an up-stairs drawer, was discredited by other proof showing bullet holes in the dining and living rooms which could not have been caused by shots fired from the stairway. The testimony of Effie Murphy to the same effect was also largely discredited by proof of her lack of veracity.

It is undisputed that Roberta was shot first, and it is common knowledge that the shock and noise of a 38-caliber revolver would daze one unaccustomed to such an experience. Her story of the scuffle with Willett, who had been drinking, for possession of the gun, her running out for the police, and her fear to re-enter her home without aid, lends credence to her defense that she actually believed he intended to kill her. She was in her own home, where she had a right to be, and where, as here, she had been put in danger, real or reasonably apparent, of losing her own life or receiving great bodily harm. She was not required to endeavor to escape from her assailant but could stand her ground and repel force with force. *Hammond* v. *People,* 199 Ill. 173; *People* v. *Durand,* 307 id. 611; *People* v. *Sterankovich,* 313 id. 556.

While it is the province of the jury to pass upon the question of guilt or innocence of an accused in the first instance, it is the duty of this court, upon review, to consider the evidence, and if, as a whole, it does not establish guilt beyond a reasonable doubt the conviction will be reversed. (*People* v. *Kazmierczyk,* 357 Ill. 592; *People* v. *Jung,* 358 id. 488; *People* v. *Gold,* 361 id. 23; *People* v. *Schiro,* id. 117.) The evidence in this case is not of that clear and convincing character that is required to establish guilt beyond a reasonable doubt. *People* v. *Rappaport,* 362 Ill. 462.

In our view of this case as above expressed, it is not necessary for us to consider any of the various errors assigned, except the principal one that there is not sufficient evidence in the record to support a verdict finding Roberta guilty of murder.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*