(No. 30088.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MELVIN LYLE LEACH, Plaintiff in Error.

*Opinion filed November 20, 1947—Rehearing denied Jan. 14, 1948.*

516

Pree & Pree, of Springfield, for plaintiff in error.

George F. Barrett, Attorney General, and John W. Curren, State's Attorney, (H. Keith Dressendorfer, of counsel,) all of Springfield, for the People.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

The defendant, Melvin Lyle Leach, was indicted by the grand jury of Sangamon County for robbery with a gun. He was tried before a jury and found guilty. Motions for a new trial and in arrest of judgment were overruled, as was also a motion for the admission of defendant to probation, and he was sentenced to the penitentiary for a term of two to six years.

The robbery occurred about ten o'clock on the evening of September 24, 1946, in the office of the manager of the State Theater in Springfield. Floyd C. Fagg, assistant manager of the theater, was in the office checking the receipts, amounting to $317.70, which had been brought in by the cashier. There was a knock on the door, and a man entered carrying a .45 automatic pistol in his hand; he told Fagg it was a holdup, and ordered him to lie on the floor. The man was in the office from seven to ten minutes, during which time Fagg remained on the floor. After warning Fagg not to notify the police, the man left, taking the receipts with him.

Because plaintiff in error contends that the prosecution failed to identify him as the man who perpetrated the crime, it will be necessary to discuss the evidence in greater detail than usual. Fagg was the chief prosecution witness on this point. He stated that he was seated at the office desk, which is close to the door; that when he heard a knock he opened the door, and a man entered; that the room was amply lighted and he had a good look at the man; that the man was wearing a leather jacket and plain dark trousers; that when the man spoke, he moved forward in the desk, and was commanded to lie on the floor; that as the man left, he looked up and saw him back out of the door; that from his position on the floor he could see only the man's feet and legs; and that the man who entered the office and took the money was the plaintiff in error, Mel-

vin Leach. The next evening Fagg went to the police station where he was shown some pictures, and he picked out the picture of plaintiff in error as the man who had robbed him. He subsequently saw plaintiff in error again in the city jail a few days later and identified him by his looks and by hearing him talk as the man who had held him up.

Lorraine Hoffert testified on behalf of the prosecution that on the evening of September 24 she met plaintiff in error in a tavern about 8 o'clock; that at the time she was in the company of Mary Curry and two men from Mt. Pulaski; that the four of them had driven down to Springfield that evening from Lincoln; that she had known plaintiff in error for about six weeks prior to September 24, and during that time had spent several nights in a hotel and a tourist camp with him; that plaintiff in error had always told her his name was Jack Morrison; that when she met plaintiff in error about 8 o'clock on the evening of September 24, he asked her if he could meet her later, and she said yes; that plaintiff in error said he had a job to do, and would meet her in Lincoln; that she and Mary Curry left their escorts and took the 11 o'clock train back to Lincoln, where they went to the Rustic Tavern; that subsequently plaintiff in error and his brother Don came into the Rustic Tavern; that plaintiff in error said they had a cab outside, and asked the two girls if they would go with them; that they all went out and got in the cab; that plaintiff in error asked Don if he would drive them to Chicago, and offered to pay him; that Don consented, and they started to Chicago; that after they got north of Bloomington, plaintiff in error took over the driving and continued until they got to Chicago; that plaintiff in error had a lot of money and a forty-five caliber pistol in his possession; that when they got to Chicago, plaintiff in error stopped at a restaurant, and got out of the cab and went in; that she never saw him after that time until

she identified him in the Springfield jail some time later; that after plaintiff in error left, and they had made an unsuccessful effort to locate him, they started back to Springfield but were stopped by State police north of Bloomington; and that she was positive that the plaintiff in error was the same person as the man who called himself Jack Morrison and with whom she had spent the nights in the hotel and tourist camp and with whom she went to Chicago on the night of the robbery.

Two waitresses, Fannie McGrew and Virginia Riel, who worked in Hill's restaurant next door to the theater, testified that on the night of the robbery plaintiff in error was in the restaurant; that he came in shortly after 9 o'clock and remained for a half to three quarters of an hour; and that he was wearing a brown leather jacket. Miss McGrew further testified that about 9:30 plaintiff in error asked her what time the theater closed; that he talked to Joyce Bostik, who was washing dishes, and also spoke to Virginia Riel, whom he mistook for a former schoolmate; that she did not wait on him; that subsequently she was shown a picture of plaintiff in error at the State's Attorney's office; that she later saw him at the jail, where he was in the line-up room with two other men; that he was not wearing a leather coat in the line-up room; and that she identified him at that time as the man who had been in the restaurant on the night of the robbery. Miss Riel testified that she came into the restaurant shortly after 9 o'clock on the evening of the robbery; that she was not working that evening; that Melvin Leach was there when she arrived; that he was wearing a tan suede jacket and dark trousers; that he spoke to her and said they had gone to school together, but he was mistaken in his identification and the conversation was not continued; that shortly before 10 o'clock she left the restaurant and went to the theater; that plaintiff in error held the door of the restaurant open for her as she left; that she went

to the theater, and when she went in to her seat he was standing by himself in the inner lobby, looking at the screen; that she saw plaintiff in error subsequently at the Springfield police station, in the show-up room; that there were three men in the group she saw at the police station; that she identified plaintiff in error by his hair, eyes, general appearance and voice; and that she is positive that the plaintiff in error is the same person she saw in Hill's restaurant on the night of the robbery.

Betty Fagg, cashier for the theater, testified for the prosecution that she was on duty the night of the robbery; that plaintiff in error came up about 8 o'clock or shortly thereafter that evening and asked when the box office closed; that he then asked her what she was doing after work, and she told him to go to hell; that he then left in the direction of Hill's restaurant; that about 9 o'clock he returned and bought a ticket from her; that he went into the theater, but came out again in a short time and went in the direction of Hill's restaurant once more; that she saw him again about ten minutes to ten, standing in the lobby at the window where popcorn and candy is sold; (the window opens into the theater lobby from Hill's restaurant which is next door;) that he was talking to Rosemary Sharp, who ran the popcorn machine; that when she took the money to the manager's office at 10 o'clock, he was standing just outside the rest room smoking; that when she came out of the office he was putting out his cigarette; that she saw him again in the show-up room at the police station; that he was on the show-up stage with two other men; and that she identified plaintiff in error on that occasion as the man who purchased a ticket from her on the night of the robbery.

The plaintiff in error produced as a witness Rosemary Sharp, who testified that she was working in Hill's restaurant on the night of the robbery and that she was positive that plaintiff in error was not in the restaurant that

evening. Donald Leach testified that he was the brother of plaintiff in error; that he is employed by the Lincoln Cab Company as a driver; that about 8:30 P.M. on the evening of the robbery he was approached by a man who asked him about a trip to Decatur; that the man was about six feet tall, with wide shoulders, and was wearing a brown leather jacket and khaki army pants; that he saw the man again about 10:15 that same evening, at the cab office; that the man, who told Donald Leach to call him Jack, was driven by Leach to Lincoln; that at Lincoln they stopped at a tavern called the Dutch Mill, and then went to the Rustic Inn tavern; that the man picked up Mrs. Hoffert at the Rustic Inn, and she brought along a girl friend named Mary; that the four of them then drove to Chicago stopping en route to buy gasoline and soda; that he allowed the man to drive as they approached Chicago, while he got in the back seat with Mary; that he had intimate relations with Mary; that after they got to Chicago, the man stopped the cab and got out without paying his fare; that he looked for the man without success, and then started back to Springfield with the girls; that they were picked up by State police north of Bloomington, and taken to the Bloomington jail; that he was subsequently brought back to the Springfield jail; that the man he took to Chicago had plenty of money on his person although he did not pay the fare; that he did not report the change in orders from driving to Decatur to driving to Lincoln because the charge for both trips was the same; and that the man who was in his cab, and whom he took to Chicago, was unknown to him and was definitely not his brother, the plaintiff in error.

In corroboration of Donald Leach's testimony, plaintiff in error introduced the testimony of Enie Antonacci, owner of the Lincoln Cab Company; John Sauer, the switchboard operator at the cab company; Walter Burke, a driver for the cab company; Leroy Leach, father of Don and plain-

tiff in error and Virgil Leach, brother of plaintiff in error and a driver for the cab company. All of these witnesses testified that they were present in or around the cab company office at 10:15 P.M. on the night of the robbery; that they saw a man about six feet tall, wearing a leather jacket and khaki pants, enter Donald Leach's cab; that they saw the cab leave, supposedly for Decatur; and that the man who entered Donald Leach's cab was not the plaintiff in error.

Plaintiff in error also sought to establish an alibi, to account for his whereabouts on the night of the robbery. His sister-in-law, Dorothy Leach (Donald's wife) testified that plaintiff in error came to her home about noon on the day of the robbery, and stayed there all night and until about 8:30 the next morning. Two neighbors, Dorothy Hickson and Viola Black (Mrs. Hickson's mother,) who lived next door to Donald Leach, testified to seeing him asleep on a cot in the Donald Leach home; Mrs. Hickson said she saw him there about 8 o'clock in the evening of September 24; and Mrs. Black said she saw him between 7:15 and 7:30 the next morning. Leroy Leach, his brother, who lives at Jacksonville, testified that he was called on the telephone by their mother on the morning after the robbery, and came over to Springfield; that when he arrived at his mother's home about 8:30, plaintiff in error was there; and that he took plaintiff in error with him on a trip to Chandlerville, leaving around 10:30 and returning about 3 in the afternoon. Mrs. Daisy Leach, plaintiff in error's mother, testified she called him home from his brother Don's house on the morning after the robbery and he arrived home about 8:30; and that he left around 10:30 with Leroy and returned about 3 in the afternoon.

The plaintiff in error took the stand in his own behalf, and testified that he went to the home of his brother about noon on the day of the robbery; that he remained there

the rest of that day and until 8 o'clock the following morning; that in response to a phone call from his mother, he then returned home, where he met his brother Leroy; that about 11 in the morning he went with Leroy to Chandlerville, returning about 3 in the afternoon; that on September 24 he was dressed in a tan shirt, light blue washable work pants, brown shoes, and no coat; that he was not wearing a suede jacket and in fact did not own and never had owned one; and that he had never seen Lorraine Hoffert before she confronted him at the police station in Springfield after his arrest. He also denied being in Hill's restaurant or the theater the night of the robbery and denied all knowledge of the crime and any guilt in connection therewith.

In rebuttal, the prosecution called five witnesses. John Lovell, a friend of Betty Fagg, testified that he was in the lobby of the State Theater from 8:45 until about 9:30 on the evening of the robbery; that he saw plaintiff in error buy a ticket from Betty Fagg; that he heard plaintiff in error converse with her, and heard Betty Fagg tell him to go to hell; that he saw plaintiff in error for five minutes or more; that Melvin Leach was wearing a leather jacket; and that he remembered plaintiff in error's face because of Betty Fagg's telling him to go to hell. Floyd Fagg and Willard Mester, the latter a member of the Springfield police force, testified that on the night of September 25, they met Rosemary Sharp in Harmony Hall, a Springfield tavern; that after showing her a picture of plaintiff in error they asked her if he was the man in Hill's restaurant on the night of the robbery; and that she replied in substance that "If that is not him it is his twin brother." Floyd Fagg also testified that he had a conversation with Rosemary Sharp in front of the police station a day or two after the robbery, in connection with the identification of plaintiff in error and that she said in substance that it may have been him and it may not have

been him. Lorraine Hoffert testified that after plaintiff in error deserted them in Chicago, she had a conversation with Donald Leach concerning Melvin's failure to pay the cab bill, and Donald Leach said in substance, "I am not going to report it to the police. I know the man and I will get my money." Austin Jones, a Springfield policeman, testified that on September 27, he had a conversation with Mrs. Donald Leach, and that she told him in substance that plaintiff in error stayed at her home on the night of September 23 (the day before the robbery); that she said plaintiff in error left after receiving a phone call from his mother on the morning of September 24, and did not return until September 26, the day he was arrested; and that Jones questioned her thoroughly to make certain she was not confused as to the dates.

The plaintiff in error argues that the foregoing evidence is insufficient to support the verdict, and cites the, familiar rule of law that the proof in a criminal case must establish the guilt of the defendant beyond all reasonable doubt. Granting the correctness of the rule, the record here shows that the prosecution has met that burden of proof. We have here the positive identification of plaintiff in error by Floyd Fagg as the man who committed the robbery. In addition, the testimony of four witnesses placed plaintiff in error at or near the scene of the robbery shortly before it occurred, and another witness testified to the fact that shortly after the robbery the plaintiff in error had a large amount of money and a gun similar to the one used in the crime. The jury heard the evidence, together with the alibi testimony offered by the defense, and had the opportunity of seeing the witnesses and observing their conduct and demeanor while testifying. The weight to be accorded to the testimony of the various witnesses was for the jury to determine. (*People* v. *Manfucci,* 359 Ill. 69.) This court will not disturb a verdict unless it is palpably contrary to the weight of the evidence, or is so

unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People* v. *Kelley,* 367 Ill. 318; *People* v. *Hicks,* 362 Ill. 238.) Plaintiff in error appears to take the position that a direct conflict in the evidence is sufficient to raise a reasonable doubt, and therefore requires a reversal of the judgment. Such is not the law. On review in this court, the verdict of the jury on questions of fact will not be disturbed unless palpably contrary to the weight of the evidence. *People* v. *Kelley,* 330 Ill. 562; *People* v. *Thompson,* 321 Ill. 594.

Plaintiff in error also argues that the identification of him as the man who committed the robbery is inconclusive, because several of the witnesses saw him alone in the police station rather than being required to pick him out of a group. However, the chief identification witness, Floyd Fagg, saw the man who robbed him in a bright light, and subsequently picked plaintiff in error's picture as the guilty party out of a number of pictures shown him by the police. That identification alone was sufficient to support the verdict. Positive testimony identifying the accused is sufficient for his conviction. *People* v. *Kelley,* 367 Ill. 318; *People* v. *Barad,* 362 Ill. 584.

It is insisted that there is a variance between the material allegations of the indictment and the proof, which is fatal. The indictment alleged that the plaintiff in error feloniously assaulted Floyd Fagg, and did rob, steal, take and carry away $317 lawful money, of the money, personal goods and property of the "Springfield Frisina Theter Corporation," a corporation organized and existing under and by virtue of the laws of the State of Illinois." At the conclusion of the prosecution's evidence it was stipulated that the correct corporate name was "Springfield-Frisina Theater Co.," and not as stated in the indictment, and that such corporation owned and operated the State theater and was duly organized and existing under the laws of the State of Illinois. A similar argument was

considered by this court in the case of *People* v. *Kubish*, 357 Ill. 531, and there rejected. The gist of the offense of robbery is the force or intimidation used in taking from the person of another, against his will, property belonging to him, or in his care, custody, or control. The ownership of the property taken is immaterial, in a robbery case, so long as it is in the care, custody or control of the person robbed. *People* v. *Guinto*, 374 Ill. 404.

Plaintiff in error argues that the court erred in permitting James Lovell to testify in rebuttal, because his testimony should have been introduced in chief. It is true that Lovell's testimony could have been introduced in chief. However, plaintiff in error was relying on an alibi, and had denied that he was in the State Theater on the night of the robbery, or had purchased a ticket from the cashier, Betty Fagg, that evening. Lovell's testimony was in direct rebuttal of that defense, and was admissible for that purpose. (*People* v. *Drysch*, 311 Ill. 342; *People* v. *Scott*, 261 Ill. 165; *People* v. *Lenhardt*, 340 Ill. 538.) The court did not abuse its discretion in allowing it to be admitted.

The plaintiff in error says that the prosecuting attorney committed prejudicial error when, in his argument to the jury, he commented on the failure of the defendant to produce as a witness a certain police officer. The record here presented does not show the entire argument, but the passage objected to opens by a recital that defense counsel "has argued to this jury the fact that we did not call Officer Ippolito to the witness stand." The State's Attorney then proceeded to say that the officer was present in the courtroom throughout the trial and available to the defense, and if the defense thought something was being concealed they could have put him on the stand and had him tell his story. This was a legitimate reply to the argument of defense counsel, and the court did not err in permitting it. *People* v. *Heywood*, 321 Ill. 380.

Plaintiff in error complains of People's instructions 7, 10 and 11, on the grounds that they attempt to define reasonable doubt. Instruction 7 does not attempt to define "reasonable doubt," but merely says that the doubt which is sufficient to sustain an acquittal must be a reasonable doubt. Instructions 10 and 11 do attempt to define reasonable doubt, a practice which we have frowned upon. (*People* v. *Rogers,* 324 Ill. 224.) However, an error in giving instructions should not be ground for reversal unless the opposing party is harmed thereby. In this case, it appears that plaintiff in error's instructions 18 and 22, which were also given by the court, likewise attempt to define reasonable doubt, the latter instruction even using language substantially identical with that claimed to be objectionable in instruction 11. It is difficult to see, under the circumstances, how the plaintiff in error can assert that he has been prejudiced.

Objection is also made to the giving of instruction 15, which instructed the jury with regard to circumstantial evidence. It is plaintiff in error's position that there was no circumstantial evidence in this case. The record reveals that the prosecution based its case on both circumstantial and direct evidence. The testimony of Mrs. Hoffert, that some time before the crime plaintiff in error told her he had a job to do and that after the crime he had a pistol similar to the one used in the robbery and also had a lot of money, was circumstantial evidence. In fact, all of the evidence except the testimony of Floyd Fagg, the person who was robbed, was circumstantial. It was therefore not error to instruct the jury with regard to that type of evidence. *People* v. *Guinto,* 374 Ill. 404.

Further objection is made to instructions 1, 2 and 16, which deal with the question of alibi. All three of these instructions are identical with instructions which we have previously approved. (*People* v. *Fedora,* 393 Ill. 165;

*People v. Thompson,* 321 Ill. 594.) The instructions were all applicable to some of the evidence, and the court did not abuse its discretion in giving them.

It is finally argued by plaintiff in error that the court erred in denying his application for probation. It appears from the record that he took the stand in his own defense, and that he told the court the whole story of his life, including his early separation from his family; his being raised in foster homes; his enlistment in the army; his AWOL record; and his subsequent honorable military service culminating in the award of a Bronze Star, Purple Heart, and an honorable discharge. When the motion for admission to probation was made, the trial judge said that he had heard all of the evidence, and he had "as complete history of the life of the said defendant as he could get on motion for probation," and therefore denied the motion. Plaintiff in error's brief suggests no additional facts which might or should have been considered. We cannot say that the judge abused his discretion in denying probation.

The judgment of the lower court is affirmed.

*Judgment affirmed.*