(No. 33077.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* DOROTHY HORTON, Plaintiff in Error.

*Opinion filed Sept. 23, 1954—Rehearing denied November 15, 1954.*

SAMUEL A. ARONFELD, and ZOE KUTA, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and SAMUEL PAPENEK, all of Chicago, of counsel,) for the People.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

The plaintiff in error, Dorothy Horton, hereinafter referred to as the defendant, was indicted in the criminal court of Cook County for the murder of Samuel Dillon.

Upon trial the jury found the defendant guilty and fixed her punishment at twenty years in the penitentiary. Judgment was entered on the verdict. Motions for a new trial and in arrest of judgment were overruled, and the defendant prosecutes a writ of error to this court.

The defendant contends that the judgment should be reversed for the following reasons: (1) the court erred in denying a motion of the defendant to direct a verdict in her favor at the close of the State's case; (2) the guilt of the defendant was not proved beyond a reasonable doubt; (3) the verdict of the jury is against the law and the evidence; (4) the court erred in giving the jury the instructions offered by the State; and (5) the court erred in refusing to give to the jury an instruction offered by the defendant.

The defendant admits the fatal shooting of Samuel Dillon on the evening of July 18, 1952, but claims she acted in self-defense.

The pathologist who performed the autopsy on the deceased the day following the shooting testified that he came to his death from bullet wounds of the chest and abdomen. He was struck by three bullets, each of which entered from the back and went through his body.

The evidence disclosed that Dillon was twenty-nine years of age, five feet seven inches tall and weighed 175 pounds. The defendant was twenty-two years old, short of stature and weighed 110 pounds. Although married and the mother of two children, she was not living with her husband and had been going out with Dillon. She said, however, that she had been trying to quit him since January, 1952, but had gone out with him since that time and while in Mississippi during May, 1952, had written him.

Dillon came to the apartment of the defendant at around eight o'clock in the evening, after being told by the defendant previously on the phone not to come, according to

the defendant's testimony. The apartment in which the defendant lived consisted of one bedroom and a kitchen, which she shared with Golden Brown, the owner of the gun used in the shooting. It was a part of a six-room flat located on the third floor of the apartment building. The bedroom was about twelve by fourteen feet in dimensions. Its only door was on the north side and opened into a hallway. This hallway ran the length of the floor. The stairway leading downstairs was at the east end of the hall, or to the right as one emerged from the bedroom. The door to the stairway was about fifteen feet from the bedroom door. The kitchen, situated at the west end of the hall, was just west of the bedroom.

A written statement of the defendant was taken at the police station the night of the shooting and offered in evidence by the prosecution, the defense making no objection that it was not voluntarily given. In this statement the defendant relates that Dillon walked into her bedroom and started an argument, accusing her of going out with somebody else. She said she denied this and that he called her a liar and began cursing her. She ran to the kitchen table and got a butcher knife. They struggled, and the knife dropped to the floor. She then broke loose from him and got a gun from the dresser in the bedroom, pointed it at him and told him to get out. She said he replied, "I am not going to get out. Go ahead and kill me." She then said, "So I shot him." She stated further that he had a stick in his hand at the time, a stick which she had used to prop a window open and which he had gotten before they began fighting. She also said he tried to push her out of the window while they were fighting. At the time she pointed the gun at him and told him to get out he was standing about three feet away. When asked in the statement if he moved in any direction after he saw the gun, she answered, "No, I guess he didn't move. He just said 'I am not going to go out. Go ahead and kill me.'" When

asked who was there at the time of the shooting, she said "Just Sam and I."

At the trial, the defendant testified that Dillon used abusive language toward her when he came into the room and threatened to kill her if she did not tell him the truth. She said he beat her across the shoulders with a stick and tried to push her out the window. She stated she then broke loose from him and got a butcher knife from the kitchen, Dillon not following her into the kitchen. When she came back to the bedroom, he took the knife away from her and then called Ronald Brooks into the room. Brooks was another resident of the apartment building. As he was questioning Brooks and had his back turned to her, she got the gun out of the dresser drawer. She testified he then whirled around toward her with the stick and the knife in his hand and again told her he was going to kill her if she did not tell him the truth. He advanced toward her, and, when he almost reached her, she shot. She fired two other shots, and, according to her testimony, all of them were fired while she was in the bedroom.

Ronald Brooks, who testified for the defense, said Dillon called him into the room just before the shooting took place. He said the deceased asked him if anybody had been coming up to see the defendant and that he told him there had not. Dillon began cursing the defendant, according to Brooks, saying, "Before I leave from here, I will know what I want to know if I have to beat you to death." Brooks, who testified "I seen he was drinking," then began backing out of the room, and Dillon started toward him. At this point the defendant made a move to get the gun, and Dillon turned toward her. Brooks stated he saw Dillon then walk toward the defendant, with the knife and stick in his hand, and after backing out of the room and into the bathroom, which was the next room down the hall on the east, he heard the three shots fired. The witness stated further that he then saw Dillon run by

him and go down the stairs. Two witnesses, called by the State in rebuttal, testified that Brooks's reputation for truth and veracity was bad and that they would not believe him under oath.

Police officer Walter Johnston testified that when he arrived on the scene he found Dillon lying on the floor of a drugstore, located in a building near the apartment building. Dillon was still alive and able to tell him by whom he was shot and where she could be found. He sent officer Patrick Gleason to the address given by Dillon. Officer Gleason brought the defendant back and gave the gun to officer Johnston. Officer Johnston stated he removed six shells from the gun, a .38 caliber Smith & Wesson revolver, three of which were empty shell casings. He said he did not notice any odor of alcohol or intoxicating beverage on the deceased.

Officer Gleason testified that he went to the defendant's apartment to pick her up. He said she told him that Dillon and she had been scuffling in the kitchen, he with a stick and she with a butcher knife, and that she went into the bedroom to get the gun. The witness said the defendant told him further that Dillon followed her into the bedroom. She told Dillon that if he kept bothering her she was going to shoot him, and with that she started to shoot. The officer testified that the defendant stated that when she began to shoot, Dillon went out the door of the bedroom into the hallway and down the stairs. Officer Gleason checked the apartment for bullet holes. He said there were two holes in the north wall of the hall about waist high, and one other in the stairway going downstairs.

Officer John Nolan also testified regarding the location of the bullet holes. He said that there were none in the bedroom itself and corroborated officer Gleason's testimony relative to the location of the two holes in the hall and the one hole down the stairway. The hole in the wall of the stairway, he testified, was in the neighborhood of

twenty to twenty-one feet from the other two holes in the hall, and the angle of the bullet as it made this hole was at a slant from the southwest, where the doorway leading to the hall was located. The officer said he observed no bruise marks on the defendant's face, arms, or lower extremities. He saw no blood stains on the bedroom floor or in the hall, but did see signs of blood on the stairway in the vicinity of the second floor.

Other witnesses for the State included the sister of the deceased and his employer. His sister identified the body at the morgue. His employer, operator of a taxicab business, testified to seeing Dillon at the cab office on July 18, 1952, and to his leaving the office at around seven o'clock that evening. The State also called Dr. Vernon G. Phillips, a clinical physician for Cook County. He examined the defendant on July 22, 1952, at which time he did not observe any bruises or marks on her body. Nor, according to his testimony, did the defendant complain or tell him of any bruises or marks about her body.

The defense called Marie Watson, a fellow worker of the defendant, Juanita Adams, an evangelist, and Helen B. Walton, an acquaintance, all of whom testified that the reputation of the defendant as a peaceable and law-abiding citizen was good. Golden Brown, who shared the apartment with the defendant, also testified. His testimony related to the rental of the apartment and his ownership of the gun.

The first three allegations of error made by the defendant concern the sufficiency of the evidence.

The determination of the guilt or innocence of an accused is a matter committed, in the first instance, to the jury, and the court will not disturb a verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to justify the court in entertaining reasonable doubt as to the defendant's guilt. (*People* v. *Carter*, 410 Ill. 462; *People*

v. *Tomaszewski,* 406 Ill. 346; *People* v. *Leach,* 398 Ill. 515; *People* v. *Rudnicki,* 394 Ill. 351.) It is within the province of the jury to determine the credibility of witnesses and weigh their testimony (*People* v. *Wilson,* 1 Ill. 2d, 178,) and it is only when some fact or circumstance appears in the evidence from which the court can say some witnesses have been truthful and others have been untruthful or mistaken will the court not regard the jury's evaluation of the credibility of witnesses as conclusive. *People* v. *Brown,* 415 Ill. 23.

Counsel for the defendant argues that the defendant was in her own home, where she had every right to be, and was there put in danger, real or apparent, by an intruder, of losing her own life or receiving great bodily harm; accordingly, she was not required to escape from the assailant but could stand her ground and repel force with force. The common-law doctrine that one must exhaust every effort to escape before he can avail himself of the right of self-defense does not prevail in this State. It has been held that if a person is in a place where he has a lawful right to be and is unlawfully assaulted and put in apparent danger of his life, or great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force, even to the taking of his assailant's life if necessary. (*People* v. *Newman,* 363 Ill. 454; *People* v. *Sterankovich,* 313 Ill. 556; *People* v. *Durand,* 307 Ill. 611; *Hammond* v. *People,* 199 Ill. 173.) However, if the evidence shows that the jury was justified in finding no element of self-defense entered into the assault the rule enunciated in these cases would be of no avail to the defendant. *People* v. *Johnson,* 2 Ill. 2d, 165; *People* v. *Smith,* 404 Ill. 125; *People* v. *Buford,* 396 Ill. 158, 163.

In this record there are certain significant facts which are undisputed and which greatly weaken the argument of the defendant that there is insufficient evidence to sustain

a conviction. The evidence shows that the three shots fired by the defendant entered the back of the deceased. Moreover the only evidence relative to location of bullet holes in the building was that there were none in the bedroom itself, there were two in the north wall of the hall opposite the doorway to the bedroom, and a third in the wall of the stairway, a distance of twenty to twenty-one feet away from the other two holes. If these physical facts are believed, and they are uncontradicted, it would have been impossible for the incident to have occurred as related by the defendant or witness Ronald Brooks. The jury could well have discounted the defendant's testimony that she shot Dillon as he was advancing toward her if they believed she shot him three times in the back. In addition, the location of the bullet holes is irreconcilable with the defendant's testimony that all three shots were fired in the bedroom. The jury could reasonably deduce from the evidence that the defendant not only did not shoot three times in self-defense, but, after shooting him twice in the back while he was in the bedroom or in the hall, pursued him down the hall and shot him again as he was going down the stairs.

There were material discrepancies between the statement of the defendant given at the police station the night of the shooting and her testimony at the trial. In the statement, which was not said to have been involuntarily made, when asked if Dillon moved in any direction after he saw the gun, she said, "No, I guess he didn't move." At the trial she testified he came toward her with a stick and a knife in his hands and she shot just before he reached her. In her statement the defendant told of running to the kitchen, which was down the hall from the bedroom, to get the knife, scuffling in the kitchen and then running into the bedroom to get the gun. She said she then pointed the gun at the deceased, told him to get out, and, when he

said he wouldn't, she shot him. At the trial, however, she said that after they were fighting in the bedroom she broke loose from him and got the knife from the kitchen. He then took the knife away from her and while they were in the bedroom he called Ronald Brooks into the room. It was while he and Brooks were talking that she got the gun, according to her testimony. These two versions vary materially, and the jury could well have considered her testimony at the trial as entitled to little weight.

We cannot say after a consideration of all the evidence that it is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify our reversing the judgment of conviction.

The fourth and fifth allegations of error made by the defendant pertain to the matter of instructions.

The defendant objects to the giving of State's instructions No. 1, No. 5, and No. 13, for the reason that they are simply abstract propositions of law which define malice (No. 1), malice aforethought (No. 5), and murder (No. 13), and which ignore the matter of self-defense and substantially eliminate the question of deliberation and intention, elements present in self-defense.

Instruction No. 1 is as follows: "The court instructs the jury, as a matter of law, that malice is not confined to ill-will toward an individual, but is intended to denote an action flowing from any wicked and corrupt motive, a thing done with a wicked mind, when the act has been attended with such circumstances as evince plain indications of a heart regardless of social duty and fatally bent on mischief. Hence, malice is implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart; and if the jury find from the evidence, beyond a reasonable doubt, that the defendant in this case committed a deliberate and cruel assault upon the deceased, Samuel Dillon, however sudden,

which showed an abandoned and malignant heart, then the jury would be warranted in finding that she committed an assault with malice, in the meaning of the law."

Instruction No. 5 is as follows: "The court instructs the jury as a matter of law, that the words 'malice aforethought' do not necessarily imply the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent; whether the design to effect death was formed on the instant or had been previously entertained is immaterial, for the malicious killing, if proved by the evidence beyond a reasonable doubt, in either case is murder under the law of this State; provided, the jury further believes, from the evidence, beyond a reasonable doubt, that no circumstances exist excusing or justifying the act or mitigating it so as to make it manslaughter."

Instruction No. 13 is as follows: "The court instructs the jury, in the language of the Statute, that murder is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied. The unlawful killing may be perpetrated by shooting or by any other of the various forms or means by which human nature may be overcome, and death thereby occasioned. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

This court in a long line of cases has approved the giving of abstract instructions defining "malice," "malice aforethought," and "murder," and not containing any reference to self-defense when such defense is relied on, where there are other proper instructions covering the law of self-defense. *People* v. *Henderson*, 398 Ill. 348; *People* v. *Weisberg*, 396 Ill. 412; *People* v. *Arcabascio*, 395 Ill. 487;

*People* v. *Autman,* 393 Ill. 262; *People* v. *Gibson,* 385 Ill. 371; *People* v. *Turner,* 385 Ill. 344; *People* v. *Grady,* 381 Ill. 224; *People* v. *DeRosa,* 378 Ill. 557; *People* v. *Gibbs,* 349 Ill. 83; *People* v. *Lucas,* 244 Ill. 603; Contra: *People* v. *Bradley,* 324 Ill. 294; *People* v. *Durand,* 307 Ill. 611.

A typical quotation of this court on this question, taken from *People* v. *Henderson,* 398 Ill. 348, at pages 357-8, is as follows: "The rule is that instructions defining murder, malice and malice aforethought, which do not direct a verdict, are not erroneous because they ignore the plea of self-defense where there are proper instructions given on that subject. A particular instruction need not contain all the law either of the case or upon a given subject. It is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theory of the People and of the defendant, respectively, and does not ignore or nullify the theory of self-defense."

While no specific reference is made in these instructions to self-defense, the jury was fully and correctly instructed on the law of self-defense by other given instructions. Therefore, we do not believe that the giving of these three instructions constituted error.

The defendant objects to State's instruction No. 8 on the ground that it is a mere abstract proposition of law and could have had no other effect than to prejudice the jury against the defendant. This instruction reads as follows: "The court instructs the jury as a matter of law, that a defendant charged with murder cannot avail herself of the claim of self-defense, as the same is defined in these instructions, if the necessity for self-defense was brought on by her own deliberate and wrongful act."

It is argued that there is no evidence in the record to show that the defendant was the assailant, and the following language, from the syllabus in *People* v. *Bradley,* 324 Ill. 294, is cited: "In a prosecution for murder, where the

evidence, although not conclusive on the question, preponderates in favor of the conclusion that the deceased was the assailant, it is error to give an instruction stating the abstract proposition that the defendant cannot avail himself of the defense of self-defense if the necessity for the killing was brought on by his own wrongful act without requiring such finding under the evidence."

We agree that the giving of this instruction is subject to criticism by reason of its not being applicable to the evidence. However, we believe the evidence is of such a character as to negative any inferences of harm from its being given. In the *Bradley case* there were other instructions deemed to be erroneous, which, coupled with the factual situation there present, warranted the court's reversing the judgment. Such is not the case here, where, but for this instruction, the jury was fully and correctly instructed and where the evidence that the defendant shot in self-defense is refuted by uncontradicted physical facts.

The defendant objects to State's instruction No. 11 on the ground that the first clause of the first paragraph of said instruction informed the jury that justifiable homicide was the killing of a human being in "necessary self-defense." This instruction is as follows: "The Court instructs the jury in the language of the Statute that justifiable homicide is the killing of a human being in necessary self-defense, as the same is defined in these instructions, or in the defense of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise, to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property or against any person or persons who manifestly intend and endeavor, in a violent, riotous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed shall

not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of these fears, and not in a spirit of revenge."

This instruction, a definition taken from section 148 of division I of the Criminal Code, was approved in *Parsons* v. *People* 218 Ill. 386. The giving of such an instruction has been criticized for not deleting therefrom reference to defense of habitation when the only defense is self-defense (*People* v. *Durand,* 307 Ill. 611,) and the use of the terms "necessary self-defense" has been condemned where there is no instruction defining these terms. (*People* v. *Triolo,* 332 Ill. 410.) In both cases, however, the court makes it clear that a reversal of the conviction is not warranted where there are other instructions fully defining the circumstances under which self-defense may be relied upon and where the law of self-defense is fully set out, as in this case.

The defendant also complains of the trial court's refusal to give an instruction offered by the defendant relating to self-defense. The giving of this instruction would have been repetitious, for the court fully instructed the jury on the law of self-defense in defendant's instructions Nos. 1, 2, and 3. Refusal to give a tendered instruction is not error when the instructions which were given accurately and fully instructed the jury and covered the ground encompassed by the refused instruction. *People* v. *Price,* 371 Ill. 137; *People* v. *Hubbs,* 401 Ill. 613.

We conclude that the evidence in this case is sufficient to sustain the conviction and that the court did not commit reversible error in its instructions to the jury.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*