(No. 30214.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CECIL HENDERSON, Plaintiff in Error.

*Opinion filed November 20, 1947.*

SCHIMMEL & SCHIMMEL, of Pittsfield, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, of Springfield, (DAVID C. WILLIAMS, State's Attorney, of Pittsfield, of counsel,) for the People.

Mr. CHIEF JUSTICE MURPHY delivered the opinion of the court:

An indictment returned in the circuit court of Pike County in November, 1946, charged that defendant Cecil Henderson had assaulted one Roy Gray with intent to murder. On a trial by jury, he was found guilty and later was sentenced to the penitentiary for a term of not less

than three nor more than ten years. A writ of error has been sued out of this court to review the record of his conviction.

The points relied on for reversal are that it was not proved beyond a reasonable doubt that defendant unlawfully assaulted Roy Gray, but that if it be found there was an unlawful assault, then the evidence does not establish that it was made with malice aforethought and with the intent to kill and murder the said Gray. It is also claimed the indictment is fatally defective and that there was error in the giving and refusal of instructions.

The fight occurred on the driveway of a gasoline service station in Pleasant Hill, a village of said county. The station is located on the southeast corner of the intersection of State Route 96, which extends east and west past the station, and a gravel road that extends north and south. The station building sits at an angle to the street, facing to the northwest. The driveway crosses in front of the station building and furnishes access to the station from either road.

About 5:30 P.M. on April 15, 1946, defendant parked his truck near the south curb line of the State route. It was slightly to the east of the entrance of the driveway, headed west. At that time an automobile was standing on the station driveway headed in the direction of the State route. The exact distance from the automobile to the truck is not shown but the inference is that they were only a few feet apart.

During the afternoon preceding the fight, defendant made inquiry for Donald Gray, a grown son of Roy Gray. While defendant was in the station building, Donald came to see what defendant wanted. There is no evidence of ill feeling existing between them before they left the building. When they went outside, they walked in the direction of the truck, stopping on the side next to the station. When near the truck they engaged in a heated discussion which

was followed by threats. Defendant testified that Donald was drinking, that he grabbed defendant's hat, threw it on the ground and with some profanity charged that he had whipped larger men than defendant and could whip him. Donald testified that defendant struck him once across the shoulder. However, all agree that defendant passed to the rear of the truck to the north side, where he obtained an iron bar which is described in the indictment as a wrecking bar. Defendant testified that while he and Donald were quarreling, Roy approached from behind and when Donald made the threat to whip defendant, Roy said that if Donald could not do it he could. Defendant says that after the threats were made by both of them, he obtained the bar. There is a conflict in the evidence as to what occurred after defendant returned to the south side of the truck. Roy claims defendant started after Donald and then ran after him. Defendant contends Roy approached him with an open knife. The evidence shows without dispute that after defendant returned to the station driveway with the bar Donald went to a point east of the station building where he obtained a wheel wrench. This he threw at defendant but missed him. The wrench landed along the roadside some three hundred feet from the station.

Roy Gray testified that before he went to the station he knew defendant was looking for Donald; that he, Roy, went to the station to ascertain what defendant wanted. Donald and defendant were both in the station when Roy arrived but they soon walked over to the side of the truck where the quarrel started. Roy testified that he did not follow them at first but later took a position near the rear of the automobile. Roy did not hear the conversation between Donald and defendant but saw defendant obtain the iron bar from the side of the truck; that after defendant obtained the bar, he approached Donald and when Donald moved over to where the wrench was lying on the

ground near the filling station, defendant made a run at him (Roy) and threatened to beat his brains out. He stated that he was frightened and backed around the rear end of the automobile and in the direction of the station building, that defendant advanced toward him with the bar raised above his head, striking at him, that he (Roy) raised his left arm over his head to ward off the blows. He stated that when he was near the door of the station building, defendant struck him with the bar on the head which rendered him unconscious, and from which he did not regain consciousness for three or four days. Besides the skull fracture he received three fractures of the left arm.

Defendant does not deny he struck the blows which injured Roy Gray but claims that whatever he did was done in necessary self-defense. In addition to the evidence of defendant which has been stated, he testified that when he returned to the south side of the truck with the bar, he told the two Grays to go away, that he did not want any trouble with them; that when Donald threw the wrench at him he sought cover behind the automobile and then started toward the door of the station building, and that while retreating toward the building he met Roy carrying the knife, that Roy cursed him and sliced him with the knife. He testified he was afraid and in defense struck Roy with the bar.

It appears that the knife with which defendant was cut belonged to Roy Gray and was in his possession when the trouble started. He stated that he never removed it from his hip pocket. The evidence is in conflict as to who used the knife to inflict the wound on defendant. After Roy was rendered unconscious by the blow and while lying on the station driveway, defendant assisted Donald and others in lifting Roy from the driveway to an automobile and in taking him to the hospital. Witness Burdette Hack testified he saw a knife in defendant's hand similar to the

one in question soon after the fight but could not identify it. Defendant had the knife at the hospital and gave it to the sheriff. The theory of the prosecution was that Roy Gray never removed the knife from his pocket, that defendant while lifting Roy from the ground and removing him to the hospital came into possession of the knife, and that defendant's knife wound was self inflicted. In support they refer to the evidence which shows that plaintiff in error's shirt was not cut over or near the wound.

Defendant exhibited the scar caused by the knife injury to the jury but its location on his body is not definitely fixed. The doctor who treated him at the hospital testified that it started about three inches from the left arm pit and extended downward to the region of the lower rib, that it was about eight inches long and two and one-half inches deep.

Two witnesses who were employed at the poultry house across Route 96, north of the filling station, two witnesses who were employed at the hardware store directly east of the filling station, two witnesses who were in the oil station when the difficulty started, and the wife of the owner of the station who was going south on the gravel road west of the station, all testified for the People, but none of them were able to give any facts as to who had the knife during the encounter and who cut defendant. Several of them were asked if Roy Gray had a knife, to which they answered that they did not see it. In the main, the witnesses for the People corroborated Roy's testimony that defendant was the aggressor. In part, some of their evidence sustained defendant's version. No one testified for defendant except defendant himself.

On the question of self-defense, the evidence is in conflict. It was for the jury to determine the credibility of the various witnesses and to attach such weight to their testimony as they thought it was entitled to. The jury accepted the testimony of the People as being the correct

version of what occurred. The jurors' acceptance of the People's theory leaves nothing for the court to determine except as to whether there is sufficient evidence, if believed to be true, to prove defendant's guilt beyond a reasonable doubt. There is uncertainty in the evidence as to whether Roy Gray had a knife in his hand before he was rendered unconscious by defendant's blow, but the evidence is convincing that defendant waged an aggressive assault on Roy and beat him with the bar over the left arm and head with more severity than could have been necessary even on defendant's own version of the occurrence. His guilt was established beyond a reasonable doubt.

On the question as to whether the evidence shows the attack was with malice aforethought and committed with the intent to murder Roy Gray, it is sufficient to state elementary principles of the crime of murder. Deliberate intention is necessary to constitute express malice but the law implies malice where no considerable provocation appears, or where all the circumstances of the killing show an abandoned and malignant heart. Defendant's action in arming himself with the bar and the evidence as to the use he made of it on Roy Gray furnishes a basis upon which the jury was warranted in finding that he acted with such an abandoned and malignant heart as to show a deliberate intent to kill.

Section 23 of Division I of the Criminal Code (Ill. Rev. Stat. 1945, chap. 38, par. 58,) provides that an assault with intent to commit murder shall subject the offender to imprisonment in the penitentiary for a term of years not less than one nor more than fourteen. Section 24 provides that whoever attempts to commit murder by poisoning, drowning or suffocating another, or by any means, shall be guilty of assault with intent to murder and punished accordingly. Defendant contends that nothwithstanding the foregoing sections, assault with intent to murder is not a statutory but a common-law offense. From this he argues

that an indictment to charge such crime must be drawn in the language stating the offense as it was known at common law. He contends that the omission of the word "feloniously" from the charging part of the indictment renders it defective. The pertinent part of the charge is "Cecil Henderson * * * did unlawfully make an assault upon one Roy Gray, in the peace of the People then and there being, with an iron bar (commonly called a wrecking bar) which said iron bar was then and there held in the hands of said Cecil Henderson, with an intent then and there unlawfully, wilfully and feloniously with malice aforethought to kill and murder the said Roy Gray contrary to the form of the Statute in such case made and provided, * * *."

*Ervington* v. *People,* 181 Ill. 408, is relied upon. In that case the indictment charged assault with intent to murder. It was alleged that the defendant held a deadly weapon in his hand with which he "wilfully and feloniously" made an assault, etc., with the intent to "unlawfully, wilfully and maliciously murder," etc.

In *People* v. *Connors,* 301 Ill. 112, a question was presented as to the necessity of including the word "burglariously" in an indictment in describing the offense where a defendant was charged with burglarizing a railroad car. The *Ervington case* was relied on by defendant The court pointed out that at common law a felony was any crime which occasioned the forfeiture of lands and goods; that there never was any such distinction in this State between those crimes which are classed as felonies and those which were misdemeanors. It was noted that there was no statute until the Criminal Code of 1874 which declared what should be regarded as felonies and what should be a misdemeanor, that such division was in no sense the division known to the common law and was not based on the same distinction. It was said that where the words "felony" and "feloniously" appear in our statutes or deci-

sions before 1874 they refer to offenses to which such terms were applicable in the common law. Reference was made to the various provisions of the Criminal Code of 1827 which referred to the distinction made between those crimes known as felonious crimes and those which were designated as below the grade of felony. Referring to such provisions, it was noted that most, if not all, the offenses "denominated felony by the common law,"—treason, murder, rape, burglary, robbery, larceny and arson, together with many other offenses—were defined in the Criminal Code and it was expressly directed that the offenses thus defined should be punished as by that act prescribed and not otherwise, and that all offenses not so defined might be punished in the discretion of the court by a fine not exceeding $100 and imprisonment not exceeding six months. It was said: "Since there were no felonies constituting a separate class of crimes in Illinois, since all crimes were defined by, and required to be prosecuted under, the statute, which was intended to be, and was, a codification of the criminal law, every indictment was, after the adoption of the code, required to be construed in accordance with the code, and was deemed sufficiently technical and correct if it stated the offense in the terms and language of this code, 'or so plainly that the nature of the offense charged may be easily understood by the jury.' 'Feloniously' ceased to be a technical word necessary to the description of offenses, for it had no other meaning in the law than its ordinary meaning of manifesting a criminal purpose. Since the existence of felonies as a separate class of crimes was not recognized in the code but they were recognized as merely having existed at common law, there was no reason why it should be regarded as necessary that any acts indictable under the Criminal Code should be described as felonious." Reference was made to section 150 which is now section 6 of division XI (par. 716) of the Criminal Code. It provided

that every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statutes creating the offense or so plainly that the nature of the offense may be easily understood by the jury. It was held that the section was intended to apply universally in the interpretation of indictments and that there was no reason, in view of the provisions of the statute, why an indictment for a crime specified under the statute should be required to conform to the common-law rule that all felonies must be charged to have been feloniously committed in order to constitute it a felony. It was held that the word "burglariously" was not necessary in stating the charge of burglary contained in the indictment in that case. To the same effect, see *People* v. *Grigsby,* 357 Ill. 141. The indictment in this case was sufficient.

Defendant contends that all the instructions given on behalf of the People when considered collectively carry an assumption of fact that defendant had made an unlawful assault on Roy Gray. The instructions are not subject to such criticism. They told the jury as to the law of the case based on the People's theory as to how it occurred, but the crucial question of fact as to whether defendant acted in necessary self-defense was not assumed against defendant by any of the instructions but was left open for the jury's determination.

An objection directed at instructions 28, 29, 32, 42 and 43 is to the effect that they were faulty in that they do not make reference to defendant's plea of self-defense. It is contended that in a case where self-defense is pleaded, an instruction on the part of the People which ignores such defense is erroneous. The rule is that instructions defining murder, malice and malice aforethought, which do not direct a verdict, are not erroneous because they ignore the plea of self-defense where there are proper instructions given on that subject. A particular instruction need not

contain all the law either of the case or upon a given subject. It is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theory of the People and of the defendant, respectively, and does not ignore or nullify the theory of self-defense. *People* v. *Weisberg*, 396 Ill. 412; *People* v. *DeRosa*, 378 Ill. 557.

Defendant contends that the court erred in refusing to give his tendered instructions 5, 6, 7, 12 and 13. The instructions that were given covered the law of the case and presented the law fully as to defendant's theory of self-defense. The substance of the instructions refused was included in the instructions given and there was no error in their refusal.

Our analysis of the record in this case shows that defendant had a fair trial, that the jury was correctly instructed and that the judgment should be affirmed.

*Judgment affirmed.*