(No. 34705.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALBERT HORODECKI, Plaintiff in Error.

*Opinion filed September 18, 1958—Rehearing denied Nov. 24, 1958.*

CHARLES A. BELLOWS, and JASON ERNEST BELLOWS, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, WILLIAM H. SOUTH, FRANCIS X. RILEY, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The defendant, Albert Horodecki, was tried before a jury in the criminal court of Cook County on an indictment charging him and two others with armed robbery in a tavern on West Sixty-third Street in the city of Chicago on May 13, 1947. The court entered judgment on the jury's verdict of guilty and sentenced him to a term of not less than 25 nor more than 40 years in the penitentiary. A writ of error was issued to review this judgment and sentence.

Defendant's principal contention for reversal is that the evidence was insufficient to prove him guilty beyond a reasonable doubt in that there was no unimpeachable identification of him as one of the three men who perpetrated the crime. He argues that the witnesses identified him only after seeing him in court as the person charged with the crime; that he was never picked out of a line-up of other persons; that the proprietor was influenced by seeing his picture in the newspaper and being told by the police that he had committed the robbery; and that the other witnesses had not recognized the newspaper picture nor given a description of him to the police. There is no dispute as to what took place at the time of the robbery since the defendant's defense was that of an alibi. The facts surrounding the robbery are important only to the extent that they add credence to the witnesses' identification of the defendant.

About 10:00 P.M. three men entered the tavern, ordered beers and were served by the proprietor. About 10:30 P.M., after four card players left the tavern, one of the trio drew a gun and announced the robbery. A second man vaulted over the bar, led the proprietor to the cash register, made him place his hands on the bar and began taking the money from the cash register. The third man, who was later identified as the defendant, took his position at one end of the bar, leaning on the counter on his left elbow and keeping his right hand in his jacket pocket. He wore a grey hat and an army field jacket with slash pockets, and maintained his station at the bar during the entire time the robbery was taking place, 20 to 30 minutes.

One of the men went through the wallets and handbags of the seven patrons sitting at the bar. The proprietor's wife, who had come into the bar to bid the patrons goodnight, fainted when she learned that the three men were engaged in a robbery. One of the lady patrons was given permission by the man standing at the end of the bar to assist her. When the proprietor's wife recovered she asked the same man if she could go into the back rooms to see about her children, and she and the lady giving first aid were granted permission to do so.

In the meantime, the man who remained at the bar was asked by one of the patrons to leave them enough money for a drink whereupon he gratuitously ordered "beers for everybody." When the men left they admonished their victims, "Don't nobody call the police or come out right away."

The trio was in the tavern about one hour with the robbery taking approximately twenty to thirty minutes of that time. The tavern was lighted by a 24-inch fluorescent light in the ceiling, another light about six feet from the entrance door, two window lights and a clock light. The man who remained at the bar was face to face with the proprietor, the proprietor's wife and one of the lady patrons, and there

was nothing to prevent his being observed by the other patrons.

During the trial the proprietor, his wife and three of the patrons identified the defendant as being the man who stood at the end of the bar. A sixth witness testified that the defendant resembled the man but she could not be sure. The other witness was unable to identify the defendant. On cross-examination the proprietor admitted that he had seen a picture of the defendant in the newspaper and was later told by the police that this was one of the men who robbed his tavern. All the witnesses admitted that they had not been called upon to pick the defendant out of a line-up of other persons, and the first time they were called upon to identify him was in the court room at the time of the first trial of the case. One of the identifying witnesses also admitted that at the first trial he had pointed out one of the jurors as the robber rather than the defendant. Defendant's identification argument is not persuasive when considered in the light of the identification of the defendant by five eyewitnesses. The testimony of these witnesses coincides on nearly every detail comprising the *res gestae* of the crime. Each of them had ample opportunity to observe the defendant during a robbery lasting from 20 to 30 minutes, conducted in a calm business-like manner, in a lighted public tavern, by a trio who not only made no attempt to disguise their identity but issued orders, conversed with the patrons, and ordered drinks "on the house."

This court is cognizant of the power of suggestion which may be exercised by police officials over witnesses when they present a person they have arrested as the perpetrator of the crime charged. Our courts must remain ever alert to detect such methods and protect those accused of crimes from becoming victims of mistaken identity. We are aware, also, that an opportunity for a witness to view a suspect within a group of other people, if conducted under

proper safeguards, would considerably strengthen the proof of identity offered at the trial of the cause. However, the failure to do so does not render the identification incompetent, (*People* v. *Coli,* 2 Ill.2d 186,) nor detract from the essential requirement that a person charged with a crime must ultimately be identified in a court of proper jurisdiction by competent evidence beyond a reasonable doubt pursuant to constitutional safeguards. It was for the jury to weigh the testimony and determine the credibility of the several witnesses. (*People* v. *Coli,* 2 Ill.2d 186; *People* v. *Barad,* 362 Ill. 584; *People* v. *Nicholson,* 404 Ill. 122; *People* v. *Leach,* 398 Ill. 515.) There was ample evidence from which the jury could conclude that the defendant was one of the participants in the robbery.

The defendant testified in his own behalf, denying that he had committed any crime, stating that he was at home with his wife and children on the night of the robbery. Four character witnesses testified to his good character and reputation during the time they had known him. There are corroborating circumstances which militate against his alibi. He left the State soon after the crime. The defendant testified that he went to Los Angeles, California, eight days after the robbery, but stated that it was for the purpose of making his home there. However, during the eighteen months he lived in California he went under the name of Albert Kasbruk and his wife and two children remained in Chicago. Moreover, a prior murder conviction record was introduced to impeach his credibility. We are of the opinion that there was sufficient competent evidence presented to the jury to support their verdict of guilty.

Defendant assigns as error that the judgment is vague, uncertain and indefinite and, therefore, a nullity, based on the following facts. In July, 1947, he was indicted for the crime of murder arising out of a separate and distinct offense and in December, 1947, he was indicted for the robbery of the tavern. In October, 1948, he was arrested

in California, waived extradition and was returned to Chicago where he was tried and found guilty of the charge of murder in February, 1949, and was sentenced to a term of twenty years for that crime. In June, 1950, trial was held on the indictment charging him with robbing the tavern but it was declared a mistrial when the jury could not agree. He was convicted at the second trial, in November, 1950, which is the subject of this appeal.

The court sentenced him to a term of not less than 25 nor more than 40 years in the penitentiary, adding: "The same to run consecutively with the sentence heretofore imposed on this defendant." Thereafter the clerk filed a motion for leave to correct the sentence in the day book or journal of the court to show specifically that the sentence for the crime of robbery was to run consecutively to the sentence for the crime of murder of which he had been previously convicted. A hearing was conducted on this motion of the clerk, and after referring to his memorial of the sentence the trial judge entered a *nunc pro tunc* order directing the clerk to amend the judgment order by adding: "Sentence to run consecutively."

The judgment clearly imposes a 25 to 40 years sentence as punishment for the crime of which the defendant was found guilty. The People concede that the judgment is not sufficiently definite and certain to make it run consecutive to the murder sentence, but is otherwise valid. It is therefore unnecessary to remand this case for further amendment of the judgment. The judgment, as here interpreted, fixes the defendant's term of punishment for this particular crime to run from the time of his delivery to the penitentiary pursuant to this judgment order regardless of how many other sentences he may be serving at that time.

Defendant next contends that the trial court erred in failing to grant the defendant a new trial because an instruction relating to identification, which had been marked

"given" by the court, was not read to the jury. The instruction stated, in substance, that in determining whether or not the identifying witnesses were mistaken the jury had a right to consider the lapse of time between the date of the crime and the occasion when the witnesses first saw the defendant, together with the circumstances existing during both occasions and from all the circumstances in evidence it was for the jury to determine whether or not the witnesses were mistaken. He argues that the failure to give this instruction denied him the opportunity to have the jury charged as to his theory of the case.

Identification of the defendant was one of the material issues of fact presented to the jury. The refusal to give any instruction on the issue of identification would have constituted reversible error, (*People* v. *Ricili,* 400 Ill. 309; *People* v. *LeMar,* 358 Ill. 58,) but it is not error if the instructions, considered as a series, fully and fairly announce the law applicable to the theory of the respective parties and do not ignore or nullify the defendant's theory that the jury should consider the circumstances of the identification to determine if the witnesses were mistaken. (*People* v. *Henderson,* 398 Ill. 348; *People* v. *Weisberg,* 396 Ill. 412; *People* v. *DeRosa,* 378 Ill. 557.) A review of the instructions shows the jury was instructed on the credibility of the witnesses; on the opportunities of the witnesses for knowing the things about which they testified; on their interest, if any, in the result of the trial; on the probability or improbability of the truth of the testimony; on the extent to which any witness was contradicted or corroborated by other credible evidence; that they should not be influenced by anything other than the law and the evidence in the case; that the surrounding circumstances might influence witnesses seeking to identify a person charged with a crime; that if the jury had a reasonable doubt of the defendant's presence when and where the crime was committed they should give him the benefit of the

doubt; and that the identification of the person under arrest brought alone before the identifying witnesses is not to be given the same weight and credibility as where the witnesses picked out the accused person from among other persons unknown to the witness. From this resumé of the instructions given, it appears that the jury was adequately instructed concerning defendant's theory of the case, and in the light of all the evidence he could not have been prejudiced by the failure of the trial court to give his instruction.

Defendant's final contention that prejudicial argument, remarks and cross-examination by the State's Attorney prevented the defendant from receiving a fair and impartial trial is not supported by the record. It would serve no useful purpose and would unduly lengthen this opinion to set forth verbatim the remarks and arguments which the defendant claims were prejudicial. The record shows that the trial judge was alert to prevent immaterial, prejudicial or irrelevant matters being presented to the jury or argued by counsel; that doubtful points of evidence were discussed outside the presence of the jury; that in each instance when irrelevant or other evidence that might be prejudicial was submitted, objections thereto were sustained and the jury immediately instructed to disregard the same. Moreover, the jury was specifically instructed in writing to disregard such matters. We find that the trial was fairly conducted, that the defendant was ably represented, and that there was sufficient evidence to support the jury's verdict of guilty.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*