(No. 42645.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. DENNIS PEARSON, Appellant.

*Opinion filed September 20, 1972.*

GERALD W. GETTY, Public Defender, of Chicago (JOHN T. MORAN, JR., and JAMES J. DOHERTY, Assistant Public Defenders, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and JAMES N. KARAHALIOS, Assistant State's Attorneys, of counsel), for the People.

262

MR. JUSTICE WARD delivered the opinion of the court:

The defendant, Dennis Pearson, who had been indicted with Nelson Weaver for aggravated kidnaping, rape, theft, armed robbery and attempted murder, was tried separately in the circuit court of Cook County and found guilty of all the charges except that of armed robbery. Concurrent sentences of 100 to 125 years for aggravated kidnaping, 100 to 125 years for rape and 5 to 10 years for theft were imposed. He was sentenced to a term of 10 to 15 years for attempt and it was ordered that this sentence was to be consecutive to the other sentences.

The principal witness for the People was the victim, Mrs. Sally Heaton. She testified that after finishing work at the Kalamazoo office of the Michigan Bell Telephone Company at 11:00 P.M. on October 22, 1968, she went to the Capri Lounge in Kalamazoo where she planned to meet several co-workers who had been bowling that evening. Shortly after her arrival, she and her friends were joined at their table by Weaver and the defendant.

At 2:00 or 2:30 A.M. the defendant, Weaver, Mrs. Heaton and the other women decided to leave the lounge. Mrs. Heaton, who lived in Mattawan, Michigan, testified that she was asked by one of her friends, Mrs. Mildred Van Tyne, to drive the defendant and Weaver to Mattawan, where they were planning to stay with a friend. She said that she agreed reluctantly and only after Mrs. Van Tyne had assured her that there was no reason to be apprehensive of the two men.

When Mrs. Heaton reached Mattawan she drove down a dead-end street towards a trailer park on the instructions of Weaver and the defendant. When they reached the end of the street, Weaver produced a revolver and told her that he and the defendant were going to take her car. She was forced into the back seat by the defendant, who then struck her several times, forcibly removed her clothing and raped her. He and Weaver then told Mrs. Heaton that they

were going to Chicago. The defendant and Weaver stopped at Benton Harbor, Michigan, where Mrs. Heaton was again raped, first by the defendant and then by Weaver. Later that morning, in the vicinity of Barrington Road and the Northwest Tollway in Cook County, Illinois, the victim was again raped by the defendant and Weaver. Weaver then attempted to strangle Mrs. Heaton. She fought back and he pulled her from the auto. She testified that Weaver said that "she was a tough, ornery bitch." The defendant replied: "Well, you know what has to be done." She said she asked the men to let her go—that she had a husband and family whom she loved and that she wanted to go home to them. The men said, she testified, that they couldn't let her go; that they would rather shoot it out with the police. At that, she said, Weaver put the gun to the back of her head and shot her. She lost consciousness and later learned that she had been shot four times. She had been shot twice in the head and bullet fragments remained in her head. Another bullet entered the right side of her neck and passed completely through to the left side. She had also been shot in the right hand. She regained consciousness and found herself "all covered with straw and hay." She was about three-quarters of a mile from a highway and started toward it. Richard Ashby, a motorist, saw Mrs. Heaton stumbling through a field adjacent to the highway. He took her to the Northwest Community Hospital in Arlington Heights.

Dr. Frederick Volini, a pathologist and the director of laboratories at the Northwest Community Hospital, told the court and jury that vaginal swabs taken from Mrs. Heaton contained sperm.

Dorothy Lamb and Rita Roberts, who had been with the victim in the Capri Lounge, testified that when the party left the Capri Lounge they saw Weaver entering Mrs. Heaton's auto and Pearson standing at the passenger door.

The only defense evidence presented was the defendant's testimony, in which he denied the crime. He

admitted that he had been at the Capri Lounge with Weaver on October 22, 1968, but he testified he was alone when he left the lounge. He said that he had phoned a friend named Dochany, who gave him a ride home. No further identification of this person was given.

At trial the defendant had available the advice of two attorneys, one from the public defender's office and one who was a private practitioner. Before trial, the defendant had expressed dissatisfaction with the public defender who had been appointed to represent him, and requested the court to appoint an attorney from the local bar association to represent him. The court then appointed the other attorney. Later, the defendant informed the court that he had decided to represent himself, and that he did not desire counsel. The court advised the defendant that he had a right to represent himself, but urged him to accept counsel. The defendant told the court that he would receive advice from counsel, but insisted on conducting his own defense. Before trial began, however, he changed his mind, and agreed to accept representation by both counsel, and was so represented until the prosecution had completed the direct examination of its final witness. Then the defendant again informed the court that he would conduct his own defense. The trial judge after unsuccessfully urging him to continue to be represented granted the defendant's request, but ordered the attorneys to remain in the courtroom to be able to advise the defendant.

The defendant first contends that he was improperly excluded from the courtroom during the instruction of the jury and during final arguments.

The record discloses that after the prosecution had completed the direct examination of its final witness, the defendant rose and began shouting vituperative and obscene epithets at the judge and jury. When this occurred the judge ordered the bailiff to escort the jury from the courtroom. Then, after a brief colloquy between counsel and the court, the defendant was told by the court that he

could not remain in the courtroom if he engaged in disruptive outbursts, and that counsel would be appointed to represent his interests in his absence. The defendant apologized for his behavior, and promised the trial judge that he would "*** conduct [himself] like a gentleman from now on ***."

When the trial resumed, the defendant immediately began another diatribe against the court, prosecutor and jury, again using obscene and insulting language. The court, after removing the jury and the defendant from the courtroom, announced that it had concluded that the defendant would continue his outbursts, and it directed the attorneys to assume active conduct of the defense. Too, on the motion of defense counsel, the court ordered a behavior clinic examination of the defendant. Dr. William Haines conducted the examination and reported his findings to the court before the trial resumed. The report stated that, "When asked why he [the defendant] broke out this morning, he replied it was a cold deliberate attempt to force the judge to give me a mistrial—I [the defendant] have heard of it being done before." Dr. Haines' evaluation was that the defendant "knows the nature of the charge and is able to cooperate with his counsel."

Prior to the resumption of the trial a bailiff, Walter Makowski, testified that after the defendant had been taken from the courtroom following his second outburst, the defendant told him, " '[W]hen I get back into the courtroom, stay far away from me because I don't want to hurt you. *** [W]hen I get out there, I am going to hurt somebody.' "

The attorneys for the defendant requested the court at the time of the second incident to exclude the defendant from the courtroom for the balance of the proceedings, and also asked the court to refuse to permit the defendant to testify. The trial court, however, permitted the defendant to testify but directed that he be

secured, apparently by handcuffs, to the witness stand. Before he testified, the court again warned him several times that he would be removed if there were any further outbursts.

Although the court permitted the defendant to testify, it ordered that at the conclusion of his testimony the defendant would be excluded from the courtroom for the balance of the trial proceedings. The court expressly stated that its decision to exclude was grounded upon its own independent conclusion that the defendant would engage in further disruptive behavior and not in response to the motion of the defense counsel that the defendant be barred from the courtroom for the remainder of the proceedings.

Before testifying, the defendant announced "a blanket objection to these proceedings," and then he apologized to the jury saying "The jury only, I apologize to." He testified as has been described and without incident. After he had testified he was removed from the courtroom and final arguments were heard and the jury instructed. There was no request made after the defendant's testimony that he be permitted to remain in the courtroom.

The defendant does not here challenge the correctness of his exclusion from the courtroom after his two outbursts. Nor is there any complaint of the defendant's having been restrained during his testimony. He does contend that by refraining from any disruptive behavior while testifying, he effectively reclaimed his right to be present during the balance of the proceedings. In claimed support of his position he cites *Illinois v. Allen (1970), 397 U.S. 337, 25 L.Ed.2d 353, 90 S.Ct. 1057,* where the Supreme Court held that an unruly defendant could properly be excluded from the courtroom. He relies upon the court's observation that "[o]nce lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts

and judicial proceedings." (*Allen, 397 U.S. at 343.*) But in *Allen* the court also observed that "there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen," including "[taking] him out of the courtroom until he promises to conduct himself properly." (397 U.S. at 343-344.) Here the defendant did not ask to be allowed to resume his place in the courtroom and, of course, he did not "promise to conduct himself properly" following the second disturbance. Rather, before testifying he said he was apologizing to the jury alone, which could hardly be considered an assurance that his behavior toward the court would be corrected. The defendant's own attorneys, with his interest in mind, had asked that he be barred from the courtroom and not be permitted to testify as well. It may be concluded that they had no doubt that the defendant would persist in his disruptive behavior and prejudice his cause. We certainly cannot say that the defendant had restored his right to be present in the courtroom.

Citing *Boykin v. Alabama, 395 U.S. 238, 23 L.Ed.2d 274, 89 S.Ct. 1709,* the defendant adds that the trial court had a duty after the defendant had finished testifying "to ascertain on the record if the defendant wished to waive his further presence until the reading of the verdicts."

There is no parallel here to *Boykin.* There the concern was whether the defendant had knowingly waived constitutional rights. Here the defendant did not voluntarily absent himself from the courtroom; there is no question of waiver. The record shows that the court repeatedly told the defendant that if he did not behave properly he would be removed from the courtroom and the trial would proceed in his absence. After the first disruptive episode, the defendant was permitted to return to the courtroom upon promising to conduct himself properly. But he immediately engaged in further disruptive behavior. There was evidence from the testimony of the bailiff that it was likely the defendant would engage in more disorderly

conduct, and the report of the physician from the behavior clinic gave evidence that the defendant was bent on deliberately causing a mistrial. The trial judge was placed in a vexing and sensitive position. We judge he acted with admirable restraint and patience in his efforts to insure a proper trial of the accused. Considering the circumstances the court had no obligation to ascertain whether the accused, as the defendant puts it, "wished to waive his further presence." See generally ABA Project on Standards for Criminal Justice (Tentative Draft 1971), Standards Relating to The Judge's Role in Dealing With Trial Disruptions.

The second contention of error the defendant makes is that he was denied a fair trial, and to support this claim he points to six instances of alleged prejudice.

First, he asserts that the victim's husband sat beside her while she testified on direct examination, and that this tended to arouse the sympathies of the jury to his prejudice. It appears, however, from the supplemental record filed here that the victim's husband did not sit beside her. The trial judge and the two assistant State's Attorneys executed affidavits in which they stated that the victim's husband did not stand or sit next to her. One of the defense attorneys, in an affidavit stated that Mrs. Heaton, who was wearing a neck brace, was assisted to the witness stand by her husband, who then took a chair next to the wall on the jury's left approximately eight feet from the witness stand, where he remained during the direct examination. The attorney said he made no objection because he did not wish to call the jury's attention to the victim's husband. He did claim that he did object to Mr. Heaton's presence next to the wall when he observed him grimace, but the record shows neither that the husband grimaced nor any objection. An objection was made to the husband's location during a recess and sustained. Thereafter Mr. Heaton occupied a seat in the spectator's area.

That the husband was seated as described during his

wife's direct testimony was ill advised but no objection was made at the time to his position. Objection could have been made outside of the jury's presence. We consider the objection was waived. (*People v. Long, 39 Ill.2d 40.*) When objection was made, the trial court took corrective action. We do not find error.

The defendant also complains that he did not receive a fair trial because of references by the prosecutor to the victim's family during the closing argument. In the first reference the assistant State's Attorney said: "Sally Heaton was kidnaped, kidnaped in Mattawan, Michigan, when they pulled that gun and they told her even though she wanted to go home to her wife—strike that—to her husband and family, that she couldn't go, that she was going to Chicago with them." In the second, he commented: " *** Sally Heaton did whatever was humanly possible to resist what happened to her, to resist being kidnaped, to resist being taken out of her home, away from her family ***." And finally he observed: " *** maybe it takes the strength of a woman, a mother, a wife—to get up off the ground after you have been shot four times and walk three-quarters of a mile ***."

The record shows that no objection was made to any of now complained-of references and we need not consider them. When a defendant fails to object " *** the irregularities [in the closing argument] *** complained of must be deemed to have been waived. [Citations.] " *People v. Donald, 29 Ill.2d 283, 287.* The references were certainly not, under the circumstances of this case, such as to require us to assess their possible effect despite the absence of objection. *People v. Fort, 14 Ill.2d 491, 500-501.*

The defendant also says there was prejudicial error in the admission of evidence showing the extent of the victim's injuries and by the assistant State's Attorney's reference to these injuries in closing argument. He cites various references to the injuries, some of which were made during the giving of testimony and some of which

were made during closing argument. The references in argument to Mrs. Heaton's injuries related to a small part of the testimony given, and there was no objection offered to them. The references or descriptions of the injuries during testimony were brief, or stated incidentally, and objections were made to only two of them. The result of that is " *** we need consider only those remarks objected to at trial since statements not objected to are waived." (*People v. Underhill, 38 Ill.2d 245, 252.*) "The fact that defendant was appearing *pro se* cannot be used as an excuse for failing to object ***." *People v. Long, 39 Ill.2d 40, 43.*

In the objected-to instances, Richard Asby, the passing motorist who took the victim to the hospital, was asked by the assistant State's Attorney to describe the condition of her clothing, and over the objection of defense counsel the witness answered, "The condition of the clothing, it was bloody." Dr. Keith Wurtz, a physician who examined Mrs. Heaton at the hospital, first testified without objection that she sustained wounds and bruises and lacerations. He was then asked to describe "her physical condition at the time that he saw her other than these multiple bruises and lacerations and the bullet wounds." Over objection, he responded: "She was critically injured and near death."

The defendant argues that in a trial for attempted murder, it is error to bring in evidence showing the extent of the victim's injuries. He points particularly to *People v. Nickolopoulos, 25 Ill.2d 451,* where a conviction for assault with a deadly weapon with intent to commit murder was reversed because of prejudice through the introduction of evidence of the victim's injuries. But there it appears there was a deliberate effort, with prejudicial results, to focus the jury's attention upon the victim's pathetic condition. We noted: "Over the objection of the defendant, the officer testified that when he lifted Kallianiotis he observed blood on the floor and that when

he removed him from the stretcher at the hospital he observed blood on the stretcher. Over objections of the defendant, Kallianiotis was permitted to testify that as a result of the shooting he was paralyzed in his left leg and had 7 holes in his intestines. The defendant was asked on cross-examination whether, when he saw Kallianiotis at the hospital, he was being fed intreveneously and had tubes down his nose. An objection to this question was sustained." 25 Ill.2d at 453.

Here, we consider the references to the victim's injuries were unstudied. We would note, too, that the defendant was charged with rape. Force is an element of that offense, and the "condition of her clothing" (*cf. People v. Walls, 33 Ill.2d 394, 399*) was not irrelevant to the question of whether force was involved.

As to Dr. Wurtz's observation that "she was critically injured, near death," the record shows there was no development or elaboration of the observation. The witness was excused immediately thereafter. We do not judge the remark was seriously, if at all, prejudicial. Considering the evidence, the condition of Mrs. Heaton should have been self-evident. We cannot reasonably attribute to the jury an opaqueness that would make it unaware that the victim's condition would have been critical.

There is no substance to the complaint that statements made by the trial court during closing arguments reflected a lack of impartiality which prejudiced the defendant. During closing argument, the defense attorney had said that the victim was in the company of single women on the night concerned. The assistant State's Attorney objected that this was not her testimony, since she had testified there were married women in the group she met that night by prearrangement. The court sustained the objection, and cautioned defense counsel to "give the facts." Shortly thereafter the court sustained another objection by the prosecutor to a statement by defense

counsel that the victim had danced with the defendant. Since this remark was contradicted by testimony in the record, the court again cautioned defense counsel to give the facts. No objection was made to these cautions by the court. We said in *People v. Jones, 29 Ill.2d 306, 309,* where a similar claim of prejudice was made: "Complaint is also made of *** a cautionary remark to [defense counsel] during his closing argument to confine himself to the evidence. The [remark was] not of such a nature as to prejudice the defendant in the eyes of the jury nor were any objections made." The court here was simply requiring counsel to limit his comment to the evidence.

The defendant says, too, he was prejudiced by the argument of the assistant State's Attorney in rebuttal. In response to the defense counsel's statements in closing argument which we have just discussed and to which the prosecutor had objected, the assistant State's Attorney began his rebuttal by remarking:

"Ladies and gentlemen, I will be brief. If you will permit me, when we began the selection of this jury, each and every attorney who examined you, who talked to you and his Honor, Judge Romiti, advised you that comments made by myself or the defense lawyers at the beginning or close of the trial is not evidence, and should not be considered as evidence. I think now the reason for such an admonishing, the reason for the law being the way it is is obvious, because just as [the defense attorney] stood up here and made up facts in his arguments—

Defense Counsel: Objection.

The Court: Proceed.

Prosecutor:—I could do the same thing if I wanted to. [The defense attorney] did not get on the witness stand and he didn't subject himself to cross-examination. He wasn't there October the 22nd and the 23rd, nor was I. I can't make up

facts, I can't add facts any more than he should be able to."

It is claimed that, in effect, the assistant State's Attorney said defense counsel had been untruthful and that it is improper for an attorney to make opposing counsel the object of derogatory comments. (*People v. Freedman, 4 Ill.2d 414.*) Though to some measure at least the comments were provoked by misstatements in the defense argument, the comments may well have exceeded the limits of proper argument. But on this record, one cannot say that the defendant was prejudiced to an extent which made his trial unfair. We observed in *People v. Palmer, 47 Ill.2d 289, 300:* "Although it is improper for the State to make statements about the defense counsel's conduct solely to inflame the prejudices of the jury, we have concluded in previous cases, as we do here, that from the entire record and the entire argument of counsel the personal attacks on the defense attorney were not of such magnitude as to justify a reversal. (*People v. Berry, 18 Ill.2d 453, People v. Burnett, 27 Ill.2d 510.*)"

Another claim of error is that the assistant State's Attorney referred to a matter not in evidence when he objected to a point in the closing argument of the defense. Mrs. Heaton had testified that she had given the defendant and Weaver a ride on the assurances of Mrs. Millie Van Tyne, who was with her that night at the Capri Lounge, that there was no reason to fear the two men. During his argument, defense counsel said: "[The victim] said that Mrs. Van Tyne had told her that she knew these fellows and they were O.K. But Mrs. Van Tyne was never brought into this courtroom." In the course of objecting successfully to this comment the prosecutor remarked: " *** counsel knows why she wasn't brought into court."

The record shows that there was a discussion in chambers regarding whether Mrs. Van Tyne would be a witness. Defense counsel told the court that the defendant had wished to call Mrs. Van Tyne as a witness, but that he

had been unsuccessful in his efforts to reach her. He also said, " \*\*\* I understand she would have been of no benefit to the defense." The assistant State's Attorney informed the court that the State had intended to call Mrs. Van Tyne, but that he had learned from persons in Kalamazoo that she was on vacation at some unknown place for the summer, and that he had been unsuccessful in his attempts to communicate with her. Both defense attorneys were present when the assistant State's Attorney gave his explanation for not producing Mrs. Van Tyne.

Under the circumstances it was improper for the defense to comment on the absence of Mrs. Van Tyne, and the court properly sustained the prosecutor's objection. We do not consider, in the light of what occurred, that the defendant can with grace or validity complain of the comment, " \*\*\* counsel knows why she wasn't brought into court." What was said in *People v. Wheeler, 5 Ill.2d 474,* is relevant: "The remarks of the State's Attorney were invited by the remarks of defendant's counsel and defendant cannot claim he was prejudiced by the reply." 5 Ill.2d at 485-486.

The defendant also argues that his sentence on the attempted murder conviction was not properly ordered to be consecutive to the sentences for the other convictions. The defendant was found guilty of aggravated kidnapping, rape, theft, and attempted murder. The trial court first imposed concurrent sentences of 100-125 years for aggravated kidnapping, 100-125 years for rape, and 5-10 years for theft. The trial court's order continued: "On the charge of attempted murder, you are sentenced to the penitentiary for not less than 10 nor more than 15 years, this sentence to be consecutive to the three sentences already imposed."

Defendant complains that this language was inappropriate to impose a consecutive sentence, and the sentences must be deemed to be concurrent. He cites *People v. Wooten, 392 Ill. 542, 544; People v. Kessler, 15 Ill.2d 514;*

and *People ex rel. Clancy v. Graydon, 329 Ill. 398,* in presumed support of his position.

*Graydon, 329 Ill. 398,* simply concerned the undisputed proposition that multiple sentences will run concurrently if there is no direction in the judgment that they are to be consecutive.

*People v. Wooten, 392 Ill. 542,* is also distinguishable because of the "extreme indefiniteness, vagueness and uncertainty" in two of the sentences concerned. There is no such problem here. In *People v. Horodecki, 15 Ill.2d 130,* the defendant in November, 1949, was found guilty of armed robbery, and sentenced to a term of 25-40 years. The trial court's order read: "The same to run consecutively with the sentence heretofore imposed on this defendant." Neither the order or the record in the case, however, reflected any other conviction which would have preceded the sentence for armed robbery. However, in a previous trial in February, 1949, he had been convicted and sentenced to 20 years for murder. In holding that could not be considered consecutive this the court observed: "The People concede that the judgment is not sufficiently definite and certain to make it run consecutive to the murder sentence, but is otherwise valid." (15 Ill.2d at 136.) There is an obviously different factual situation here.

*People v. Kessler, 15 Ill.2d 514,* does not support the position of the defendant. There, the defendant, who had been convicted of five distinct forgery offenses and one charge of assault to commit murder, was given consecutive sentences on each conviction. His contention was that the language of the trial judge was so ambiguous and unclear that the sentences must be deemed to be concurrent as a matter of law. This court rejected that contention, saying: "The sentences in question are not so ambiguous and uncertain that they would require the aid of a court to construe them, nor would those required to execute them be unable to tell from the wording when one begins and

the other ends. It is clear from the record that the trial judge intended the sentences to be served consecutively. *People v. Ferguson, 410 Ill. 87."* 15 Ill.2d at 516.

Here undoubtedly the trial court intended that the sentence for attempted murder was to be consecutive to the three concurrent sentences imposed for rape, aggravated kidnaping, and theft, and its language expressed that intent with certainty. The court was not required to specify the date on which the consecutive sentence would commence. *People v. Ferguson, 410 Ill. 87, 92.*

Arguing in the alternative, the defendant says that should it be held that the sentence on the attempted murder charge is to be served consecutively to the other sentences, the imposition of a consecutive sentence was invalid, because the attempted murder offense "rose out of the same transaction" as the other offenses. It is incorrectly said that the holding in *People v. Stingley, 414 Ill. 398,* supports this contention. First, the factual setting of *Stingley* was quite different from the one here. In *Stingley* there was a single physical assault upon the victim, after which he was charged and found guilty of assault with intent to rape and with assault with intent to murder. It was ordered that the sentence imposed for assault with intent to murder was to be consecutive to the one imposed for assault with intent to rape. This court in holding that a consecutive sentence was not warranted, noted that the issue pertained "to consecutive sentences upon separate convictions for independent felonies arising out of the same transgression and charged in the same indictment." (414 Ill. at 400.) Here the "transgression" or the conduct of attempted murder was separate and different from the conduct in the other offenses of which the defendant was also convicted.

To explain, our statute concerning consecutive sentences provides: "When a person shall have been convicted of 2 or more offenses which did not result from the same conduct, either before or after sentence has been pro-

nounced upon him for either, the court in its discretion may order that the term of imprisonment upon any one of the convictions may commence at the expiration of the term of imprisonment upon any other of the offenses." (Ill.Rev.Stat. 1967, ch. 38, par. 1-7(m).) Thus, this section " *** literally authorizes consecutive sentences when a person has been convicted of 2 or more offenses which did not result from the same conduct ***." *People v. Raby, 40 Ill.2d 392, 404.*

Section 2—4 of the Criminal Code of 1961, defining "conduct" states: " 'Conduct' means an act or a series of acts, and the accompanying mental state." Article 4 (Criminal Act and Mental State), sections 4—1 to 4—9 inclusive, of the Code considers mental states. Section 4—4, in referring to intent, provides: "A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct."

The Committee Comments to subsection (m) of section 1—7 of the Code, are: "Subsection (m) is intended to codify the holding in People v. Schlenger, 13 Ill.2d 63, 147 N.E.2d 316 (1958), by the implicit converse of the provision stated, *i.e.,* if the offenses resulted from the same conduct the defendant may not be sentenced on both, either concurrently or consecutively. 'Conduct' is defined in section 2—4 and is used in the sense of 'the same transaction' discussed in Schlenger, *supra.*" S.H.A. ch. 38, sec. 1—7, p. 37.

In *Schlenger, 13 Ill.2d 63,* referred to in the Committee Comments, the defendant had pleaded guilty to an indictment of two counts which charged armed robbery and grand larceny. He received a sentence of 5 to 15 years on the first count of armed robbery and a sentence of 5 to 10 years on the larceny count. It was ordered by the trial court that the latter sentence was to run concurrently with the robbery sentence. This court upheld the defendant's

contention that the crimes of robbery and larceny were "related to a single transaction" and should have been charged in a single count. It was observed "that armed robbery necessarily involves an unlawful taking *** [and] the second sentence for larceny is unnecessary [and] superfluous ***." 13 Ill.2d at 66.

Applying what we have said to the defendant's argument, it is clear that the trial court was authorized to order that the sentence for attempted murder was to run consecutively to the concurrent sentences for kidnaping, rape and theft. As in *People v. Raby, 40 Ill.2d 392,* those other offenses had been completed before the attempt at murder was begun and there was no necessary relationship between the attempt and the preceding offenses. The act or "conduct" in the murder attempt and the mental state which accompanied it were different from the prior acts or conduct and the prior mental states involved in the other crimes of kidnaping, rape and theft.

The concept underlying section 1—7(m) of the Criminal Code is that it would be plainly unconscionable to permit double punishments to be successively served for the same conduct. Hence, our statute will permit consecutive punishments only when the offenses of which the accused has been found guilty did not result from the same conduct. Here the conduct for which the consecutive sentence was imposed was based on conduct different from that in the other offenses for which he had been sentenced. The trial court's imposition of a consecutive sentence for the offense of attempted murder was proper under section 1—7(m).

For the reasons we have given, the judgment of the circuit court is affirmed.

*Judgment affirmed.*