(No. 53668.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. EARNEST JACKSON, Appellee.

*Opinion filed March 18, 1981.*

Tyrone C. Fahner and William J. Scott, Attorneys General, of Springfield, and Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Terry A. Mertel, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Thomas Lilien, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Earnest Jackson, was found guilty of two counts of armed robbery and one count of aggravated kidnapping by a jury in the Will County circuit court and sentenced to three concurrent 12-year terms. The appellate court reversed, one judge dissenting (84 Ill. App. 3d 172), holding that rebuttal statements made by the prosecution during closing argument constituted plain error mandating a new trial. We allowed the State's petition for leave to appeal. A review of the evidence will be helpful in assessing the validity of the appellate court's reasoning.

The charges on which defendant was convicted arose from an incident on June 3, 1978, involving admitted prostitutes Loretta Sutherland and Patty Casterberry. Miss Sutherland testified that she was walking down Eastern Avenue in Joliet with Miss Casterberry at 11:30 that night. A brown car pulled up and a man got out, walking slowly in front of the women. As they came up to him he turned and pulled an automatic pistol, told them not to run, and ordered them into the brown car which pulled alongside. As the women entered the back seat of the car the driver ordered them to lie on the floor. Miss Sutherland identified the defendant as that driver. The gunman

told defendant to get on Interstate 80 and ordered the women to throw their purses to him. Miss Sutherland stated there was about $200 in her purse at the time and the gunman said they had hit the jackpot. She then testified that the defendant said, "I told you Joliet was easy."

She requested to be let go since the men had their money, but the gunman told her to shut up and not to ask gangsters any questions. The defendant turned off Interstate 80 at Interstate 57. At this point the gunman lit a marijuana cigarette and passed it to Miss Sutherland and Miss Casterberry, who each took one puff. The defendant and the gunman finished the cigarette. The gun was held on the women throughout the drive.

The defendant left Interstate 57 at Stony Island and 103rd Street in Chicago and drove to a forest preserve, where he parked. The gunman and defendant got out of the car and talked across the hood. Miss Sutherland was allowed by the gunman at this point, as she put it, to use the bathroom, squatting on the pavement by the car. She was then put in the back seat with the gunman, and Miss Casterberry was put in the front seat with the defendant. Miss Sutherland testified that she was forced to have sexual intercourse and oral sex with the gunman without her consent.

After about an hour another car pulled into the area. Miss Sutherland testified that the men were going to switch women, but the gunman wanted to leave because of the other car. The women were told after leaving the forest preserve that they were going to be dropped off at a truck stop to make money for their pimps. Both women denied having a pimp.

The defendant drove to the rear of a 159th Street truck stop, and the women were told to get out and run and not to look back. Miss Casterberry climbed out and ran, but Miss Sutherland just walked fast, looking back

to get the license plate number of the car, which she stated was a brown Buick. She thought the plate number had been 779109.

The women called a cab to take them back to Joliet, for which Miss Sutherland paid with money she had hidden in her sock when she first got into the car. She did not call the police from the truck stop, but upon returning to Joliet for Miss Casterberry's car, they saw Officer Abernathy, whom they knew to be a Joliet police officer. They told him of the incident and asked him what they should do. He told them to report it at the police station, which they did.

Miss Sutherland stated that on June 19, 1978, she went to Chicago with Miss Casterberry, Officer Abernathy and another officer to view a lineup in a Chicago police station. Miss Sutherland and Miss Casterberry were separated at the police station, and each viewed the lineup alone. Each identified the defendant as the driver of the car.

Miss Casterberry's testimony was essentially the same as Miss Sutherland's. The two women had been at her cousin's house on Eastern Avenue before they were forced into the car by the gunman. She also identified the defendant as the driver of the brown car. She threw her purse, which contained about $250, to the gunman. She noted the exchange in which defendant said, "I told you Joliet was easy," and related the drive to the forest preserve. She asked five or six times to be let out of the car during the ride. The forest preserve parking lot was near some trees and not lighted. She was told to get in the front seat of the car, where she was forced to have sexual intercourse and oral sex with the defendant.

Miss Casterberry testified that when defendant was done having sex with her, he told the gunman to switch the women. They did not switch but decided to leave when the other car pulled into the parking lot. She was

dropped off at the truck stop and ran, looking back when she was far away. She stated she looked back for the license number and got the first three numbers, 779. Upon returning to Joliet and seeing Officer Abernathy they went right to the police station to report the incident. She also testified as to the lineup at which defendant was identified as the driver.

Investigator Eshoo of the Chicago police department testified that he assisted the Joliet police in a lineup on June 19, 1978, at a Chicago police station. He told the defendant there was going to be a lineup concerning the robbery of two women from Joliet. He testified that defendant responded, "Ain't that something, couple of whores are beefing that I robbed them." Investigator Eshoo had not, prior to this statement by defendant, informed him that the victims in this case were prostitutes.

Officer Blanc of the Chicago police department testified that on June 19, 1978, he arranged a lineup in cooperation with the Joliet police department. He stated that Miss Sutherland and Miss Casterberry viewed the lineup separately and each identified the defendant.

Detective Abernathy of the Joliet police department testified that on the morning of June 4, 1978, he was informed by Miss Sutherland and Miss Casterberry that they had been involved in an armed robbery and kidnapping. They wanted to know what they should do, and he told them to make an official report at the police station. He later went to Chicago on June 19, 1978, with Miss Sutherland, Miss Casterberry and Detective Gerdes to view an in-person lineup. They returned to Joliet with the defendant following the lineup.

Kalousheia Marshall testified for the defendant that on June 2, 1978, he owned a tavern in Chicago. He had known defendant for some time. At 10:30 that night he had a conversation with defendant on the corner outside

his bar. He testified that he talked with defendant for 45 minutes to an hour. On cross-examination he stated that he was on foot outside his bar and defendant came up to talk to him.

Earnest Jackson testified in his own defense that he was a truck driver and had previously served in the Army. He had been in Ohio on June 2, 1978, in connection with his truck-driving job. He stated that from 9 to 10 p.m. on June 3 he was at his sister's house. He then drove in his car, a brown Buick with the license number 799109, to 52nd Street and Halsted in Chicago, where he saw his friend Kalousheia. He talked to him for about an hour. When he left he headed for the truck stop at 159th Street to buy some supplies. He had been to the truck stop on a number of prior occasions and had observed prostitutes in the area. On the way there he met a young woman named Betty Wilkes, who is a neighbor of his mother. She was waiting for a bus at 59th and Halsted, and defendant asked her if she wanted a ride home. He told her he had to first pick up some papers and would be about an hour. She accepted the ride and went with him to the truck stop. Defendant went inside to buy a road atlas and blue jeans. He met a truck driver he knew on his way out, and they talked outside the truck stop entrance about 20 feet from defendant's car for about an hour. While talking, two women approached them and asked if they wanted to do something. Defendant said no, and the women made a smart remark and walked away. He could not identify the women but said they had a lot of makeup and wigs on. Defendant then left with Betty Wilkes and went to his mother's home. It was about 3 a.m. when he arrived. Defendant did not remember if he had said something about two whores to a Chicago detective at the time of the lineup, and he denied ever having been to Joliet prior to June 19. On cross-examination the defendant stated that he introduced Betty Wilkes to his friend at the truck stop

as she was sitting in the car. He also stated that Betty Wilkes had seen the women approach him at the truck stop.

Betty Wilkes testified for the defendant that she had known him for about two years. In response to whether she had seen defendant on June 2, 1978, between 10 and 12 in the evening, she stated she saw him between 12:15 and 12:30. She was waiting for a bus, but accepted a ride from the defendant. She rode with him to the 159th Street truck stop, where he picked up some papers. She remained in the car about an hour and dozed off once. The defendant was talking to a man when he came out of the truck stop. She did not remember seeing any women. She then left with the defendant and arrived home about 3 a.m. On cross-examination she did not remember defendant bringing the other man to meet her, as defendant had testified he did.

The prosecution called one rebuttal witness, Cindi Phillips, an investigator for the Will County State's Attorney, who testified that two days previously she had interviewed Kalousheia Marshall outside the doors of the courtroom in the presence of the prosecuting attorney. Marshall stated in response to her question regarding his meeting with defendant about 10:30 or 11 on the night of June 3, 1978, that he came in an automobile. He drove up to 52nd and Halsted and got out of his car to talk with the defendant. He did not know whether the defendant had a car.

Defendant's argument for reversal is mainly predicated on the following rebuttal statement by the prosecutor:

> "[Defense counsel] used the term outlaw and felon. He said that's the way you were supposed to look at Mr. Jackson from the State's point of view.
>
> That is the way I want you to look at him, as an outlaw and a felon. He told us Mr. Jackson came back from the Service. He has made much note of the fact Mr. Jackson was in the Service. I thank Mr. Jackson for his service to

our country.

He said he came back to his job. Which job? His truck driver job or his armed robbery job?"

No objection was made to this comment, although a general objection was made to the prosecutor's closing words. Reminding the jury of Miss Sutherland's and Miss Casterberry's testimony that the gunman said, "We hit the jackpot," and that that defendant replied, "I told you Joliet was easy," the assistant State's Attorney stated:

"And I'm telling you, ladies and gentlemen, if you come back with a verdict of not guilty, then he is right."

Defense counsel did not state the grounds for his objection or request a ruling on the objection. He was "just" objecting. The defendant did not raise either point as error in his motion for a new trial.

Despite the absence of any objection at the time it was made and its omission from the post-trial motion, the appellate court held the prosecution's reference to defendant's "armed robbery job" constituted plain error. While that statement, ambiguous as it appears to us, was neither persuasive nor desirable argument, we doubt that it, as the appellate court held, necessarily implied that defendant's occupation was armed robbery. Nor do we agree, given the evidence as to defendant's "easy target" statement, that the prosecutor's closing reference was objectionable. The appellate court had noted that the reference to Joliet as an easy target might be considered harmless error under some circumstances, but the combined effect of the arguments was not harmless.

We need not, however, consider at length the merits of the appellate court's holding that the argument was objectionable, for it is well settled that, when a defendant fails to make a timely objection at trial or in the post-trial motion, irregularities in the closing argument complained of on review are ordinarily deemed waived. (*People v. Precup* (1978), 73 Ill. 2d 7; *People v. Killebrew* (1973),

55 Ill. 2d 337; *People v. Pearson* (1972), 52 Ill. 2d 260; *People v. Winters* (1963), 29 Ill. 2d 74.) Timely and specific objection at trial affords the court an opportunity to prevent most errors by sustaining the objection or instructing the jury to disregard the answer or remark. (*People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Baptist* (1979), 76 Ill. 2d 19.) And specific references in post-trial motions to the reasons why a trial judge's actions or rulings were wrong enables him to reconsider their propriety in a less pressured environment. If an egregious error has actually occurred, the judge can order a new trial, thus avoiding the delay and expense of appellate review.

However, the waiver rule is not absolute. This court has held that, even in the absence of objection in the trial court, substantial error may be considered if the argument was so seriously prejudicial as to prevent the defendant from receiving a fair trial. Our Rule 615(a) provides for this exception:

> "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (73 Ill. 2d R. 615(a).)

This rule does not require a reviewing court to consider all errors involving substantial rights whether or not they have been brought to the attention of the trial court. (*People v. Precup* (1978), 73 Ill. 2d 7, 16.) Before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed. *People v. Foster* (1979), 76 Ill. 2d 365, 380.

This court observed in *People v. Carlson* (1980), 79 Ill. 2d 564, 576:

> "A significant purpose of the plain error exception to the waiver doctrine is to correct any serious injustices which have been done to the defendant. It therefore becomes relevant to examine the

> strength or weakness of the evidence against him; if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved. Thus, this court has held that where the evidence is closely balanced, a court of review may consider errors that have not been properly preserved for review."

We do not regard the evidence in this case as "closely balanced," and we note that it is not contended that the evidence is insufficient to establish defendant's guilt beyond a reasonable doubt. The two complaining witnesses, admitting their unsavory occupation, did positively identify the defendant as the driver of the car in which they were kidnapped and robbed at gunpoint. Defendant's testimony was slightly contradicted by his alibi witnesses. He admitted being at the truck stop on the night in question, and his car, which matched the witnesses' description, had a license number only one digit different from that recorded by Miss Sutherland. Additionally, defendant volunteered the comment prior to the lineup concerning the "two whores" without having been told the victims of the armed robbery were prostitutes.

A prosecutor may properly comment unfavorably on the defendant and the violence of the crime, when supported by the evidence, and speak of the evil results of crime and the benefits of a fearless administration of the law. (*People v. Benedik* (1974), 56 Ill. 2d 306; *People v. Wright* (1963), 27 Ill. 2d 497, *cert. denied* (1963), 375 U.S. 925, 11 L. Ed. 2d 167, 84 S. Ct. 271.) Even if the comments complained of here were considered to be error, they are not so substantial as to come within our plain error rule. In our judgment the verdict in this case could not have been otherwise had the improper remarks not been made. *People v. Dukett* (1974), 56 Ill. 2d 432, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95

S. Ct. 226; *People v. Davis* (1970), 46 Ill. 2d 554; *People v. Berry* (1960), 18 Ill. 2d 453, *cert. denied* (1960), 364 U.S. 846, 5 L. Ed. 2d 69, 81 S. Ct. 87.

The judgment of the appellate court is accordingly reversed and the cause remanded to that court for consideration of the defendants' contention that the sentences were excessive.

*Reversed and remanded,*
*with directions.*